**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| STATE OF FLORIDA, | ) | CIVIL ACTION NO. CV-90-BE-01331-E |
| | ) | |
| Intervenor/Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES ARMY | ) | |
| CORPS OF ENGINEERS, | ) | |
| FRANCIS J. HARVEY, | ) | |
| JOHN PAUL WOODLEY, JR., | ) | |
| CARL A. STROCK, MAJ. GEN. | ) | |
| RANDALL R. CASTRO, | ) | |
| COL. PETER TAYLOR, | ) | |
| UNITED STATES FISH AND | ) | |
| WILDLIFE SERVICE, AND | ) | |
| GAIL CARMODY, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| ATLANTA REGIONAL | ) | |
| COMMISSION, STATE OF | ) | |
| GEORGIA, GWINNETT COUNTY | ) | |
| GEORGIA, AND LAKE LANIER | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Intervenors/Defendants. | ) | |

## THE STATE OF ALABAMA'S FIFTH AMENDED AND SUPPLEMENTED COMPLAINT

The State of Alabama ("Alabama") submits this Fifth Amended and Supplemented

Complaint against the United States Army Corps of Engineers (the "Corps") and the officers of

the Corps named herein, and the United States Fish & Wildlife Service, a Bureau of the United

States Department of the Interior along with one of its officials,[1] and states:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1332,

1346, 1361, and 2201; 5 U.S.C.§§ 552b, 701-706; 43 U.S.C. §§390(b); 33 U.S.C. §708; and 42

U.S.C. §§4321 et seq.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## NATURE OF ACTION

3.     This is an action against the Corps for declaratory and injunctive relief under the

Administrative Procedure Act, 5 U.S.C. §551 et seq., ("APA") with regard to discrete actions

and discrete failures to act of the defendants in their official capacities as officers of the United

States Army Corps of Engineers responsible for operation and management of the dams,

reservoirs, hydroelectric generating facilities, and navigation channels in the Alabama-Coosa-

Tallapoosa ("ACT") and Apalachicola-Chattahoochee-Flint ("ACF") River Basins, specifically

including but not limited to Lake Sidney Lanier ("Lake Lanier"), Lake W.F. George ("Lake

Eufaula"), West Point Lake, Lake Allatoona, and Carters Lake. In addition, the Ninth Cause of

Action adds a claim under the APA against the United States Fish & Wildlife Service based on

the Biological Opinion (hereinafter the "BiOp") issued by that agency on September 5, 2006,

relating to three protected species in the Apalachicola River Basin. Alabama hereby alleges that

each of the acts, and failures to act, described below constitute "final agency action" under the

Administrative Procedure Act, 5. U.S.C. § 701, et seq. and are subject to judicial review by this

---

[1] As used throughout this Fifth Amended and Supplemented Complaint, the term "Corps" specifically includes and references the officers of the Corps that have been named as individual defendants. The term "FWS" refers to the United States Fish & Wildlife Service and the official of FWS who has been named as an individual defendant.

Court.

4.    More specifically, Alabama alleges that the discrete acts and failures to act complained of herein constitute "agency action" as defined by 5 U.S.C. § 551(13), and are reviewable by this Court pursuant to 5 U.S.C. §704.  These have included final dispositions in various matters, the granting of permission or assistance to various persons, and the taking of actions on the application or petition of, and beneficial to, various persons, or the equivalent thereof, including those described in the following paragraphs.  The agency actions complained of herein should be held unlawful and set aside under the provisions of 5 U.S.C. § 706(2), and the Corps' failures to act complained of herein have been unlawfully withheld or unreasonably delayed and should be compelled under 5 U.S.C. § 706(1).

5.    Alabama also seeks declaratory and injunctive relief against the Corps under the citizen suit provisions of the Endangered Species Act (ESA), 16 U.S.C. § 1560(g), for the violations of that statute set forth below.

## THE PARTIES

**Plaintiffs**

6.    Plaintiff, the State of Alabama, brings this action in its own capacity as the trustee of the natural resources and environment of the State of Alabama based upon irreparable harm to its proprietary interests as a proximate result of the acts and omissions alleged herein, and in its representative capacity as *parens patriae* for the citizens of Alabama based upon irreparable harm to the general welfare of the State and its citizens at large as a proximate result of the acts and omissions alleged herein.  Specifically, Alabama alleges that the acts and omissions complained of herein have had, are having, and will continue to have a serious detrimental impact on real property (including but not limited to riparian property), economic interests, riparian interests, other property interests, and aesthetic, environmental, ecological, and

3

recreational interests in Alabama. The State of Florida has intervened in this action as a plaintiff, and Alabama Power Company and the City of Montgomery Water and Sewer Board have moved to intervene as plaintiffs.

**Defendants**

7.     Defendant, the United States Army Corps of Engineers, is one of the basic branches of the United States Army. The Corps' Mobile, Alabama District Office is directly responsible for maintaining and operating federally owned and operated reservoirs in the ACF and ACT Basins, including Lake Lanier, Lake Allatoona, and Carters Lake, pursuant to numerous federal statutes. In addition, the Corps is a signatory to a certain settlement agreement (the "Settlement Agreement") relating to the operation of Lake Lanier, as more fully described below. If implemented, the Corps' obligations under the Settlement Agreement will be discharged from the Mobile District Office. The Corps is subject to the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §4321 et seq., and pursuant to the provisions of NEPA, the Corps must determine the extent of environmental review necessary for any "Major Federal Action" before authorizing, implementing or committing to any action which may significantly affect the quality of the human environment.

8.     Defendant Francis J. Harvey, the Secretary of the United States Army, has overall responsibility for the Corps, which, among other things, includes responsibility for the management of Lake Lanier, Lake Allatoona, and Carters Lake. He is named in his official capacity, and may be served at the Department of the Army, 101 Army Pentagon, Washington, D.C. 20310-0101.

9.     Defendant John Paul Woodley, Jr. is the Assistant Secretary of the United States Army (Civil Works) and has direct supervisory responsibility for the activities of the Corps,

4

including those at Lake Lanier, Lake Allatoona, and Carters Lake. He is named in his official

capacity, and may be served at the Department of the Army, 108 Army Pentagon, Washington,

D.C. 20310-0108.

10.     Defendant Lt. Gen. Carl A. Strock is the Commander of the Corps who oversees

and directs the activities of the Corps, including those at Lake Lanier, Lake Allatoona, and

Carters Lake. He is named in his official capacity, and may be served at United States Army

Corps of Engineers, 441 G Street, N.W., Washington, D.C. 20314-1000.

11.     Defendant Brigadier General Michael J. Walsh is the Corps' South Atlantic

Division Commander who oversees and directs the activities of the Corps in the South Atlantic

Division, including activities at Lake Lanier, Lake Allatoona, and Carters Lake. He is named in

his official capacity, and may be served at U.S. Army Corps of Engineers, SAD, 60 Forsythe

Street, SW, Room 9M15, Atlanta, GA 30303-8801.

12.     Defendant Col. Peter Taylor is the Corps' Mobile, Alabama District Commander

who directly oversees and controls the activities of the Corps in the Mobile, Alabama District,

including those at Lake Lanier, Lake Allatoona, and Carters Lake. He is named in his official

capacity, and may be served at U.S. Army Corps of Engineers, 190 Saint Joseph Street, Mobile,

AL 36602-3630. Under the terms of the Settlement Agreement, he has direct responsibility for

ensuring the performance of the Corps' obligations regarding the operation of Lake Lanier.

13.     Defendant United States Fish & Wildlife Service, a Bureau of the United States

Department of the Interior, is the principal federal agency for conserving, protecting, and

enhancing fish, wildlife, plants and their habitats. To that end, FWS is charged with the

administration and enforcement of the Endangered Species Act ("ESA"). FWS is responsible

for the Biological Opinion issued, after completion of formal consultation with the Corps, on

September 5, 2006. That Biological Opinion relates to the Corps' actual and proposed operation of federal reservoirs in the ACF Basin and the impacts of those operations on the continued existence of and recovery of three federally protected species in the ACF Basin. The FWS may be served at its headquarters, located at Main Interior, 1849 C Street NW, Room 3238 Washington, District Of Columbia 20240-0001. Defendant Gail Carmody is sued in her official capacity as the Field Supervisor of the FWS Field Office that issued the Biological Opinion at issue in this case. Ms. Carmody may be served at the United States Fish & Wildlife Service Field Office, 1601 Balboa Avenue, Panama City, Florida 32405.

14. Intervenor Atlanta Regional Commission ("ARC") is a public, non-profit organization that has entered into negotiations and agreements with the Corps for water storage in the ACF and ACT Basins. By statute, the ARC acts as agent for various municipal and governmental bodies in the metropolitan Atlanta area. Under the terms of the water supply contracts contemplated by the Settlement Agreement as more fully described below, ARC is the expressly authorized contracting agent for the City of Atlanta, Georgia, the Cobb County – Marrietta Water Authority, DeKalb County, Georgia, and the City of Atlanta and Fulton County, Georgia, by and through the Fulton County Water Resources Commission. The ARC acts as an expressly authorized agent representing the above referenced water supply providers in dealings with the Corps. By intervening, ARC has waived any objections it may have otherwise had based on venue or personal jurisdiction. Alabama does not at this time seek any affirmative relief from intervenor ARC.

15. Intervenor State of Georgia has voluntarily submitted itself to the jurisdiction of this Court by intervening in this action on its own behalf and as *parens patriae* on behalf of its citizens. By intervening in its *parens patriae* capacity, the State of Georgia is presumed to

6

represent the interests of all of its citizens and political subdivisions. By voluntarily intervening

in this action, the State of Georgia has waived its sovereign immunity rights and any objection it

may have otherwise had regarding venue or personal jurisdiction. Alabama does not assert any

claims against or seek any relief from Intervenor-Defendant State of Georgia.

16.     Intervenors Alabama Power Company and City of Montgomery Water Works and

Sanitary Sewer Authority claim economic interests in the waters of the ACF and ACT Basin.

Alabama does not seeks any affirmative relief from these intervenors at this time.

17.     Intervenor Lake Lanier Association claims recreational and economic interests in

Lake Lanier. Alabama does not seek any affirmative relief from Lake Lanier Association at this

time.

## GENERAL BACKGROUND

### ACF and ACT Basins

18.     The Chattahoochee River originates in the mountains of northern Georgia, flows

southward to become part of the border between Georgia and Alabama, and joins the Flint River

to become the Apalachicola River, which flows through northern Florida into the Apalachicola

Bay and Gulf of Mexico. These three interconnected rivers, along with their respective

tributaries, make up the Apalachicola-Chattahoochee-Flint River Basin (the "ACF Basin").

Alabama owns property in the ACF Basin and adjacent and riparian to the waters of the

Chattahoochee River as they exist today, and citizens of Alabama have an interest in and use and

enjoy the waters of the ACF. The ACF Basin includes numerous counties within the State of

Alabama and represents a vital natural resource for these counties as well as the State of

Alabama and its citizens as a whole. These counties and their citizens have valuable economic,

property, recreational, riparian, and environmental interests that are dependent upon the Corps'

lawful, neutral and objective management of Lake Lanier and other federally-owned reservoirs

in the ACF Basin in a manner consistent with applicable law and the Congressionally authorized

purposes of those reservoirs. The Corps' discrete actions and failures to act have breached and,

unless stopped by this Court, will continue to breach, its specific statutory and regulatory duties

to maintain the environmental, ecological, and economic qualities and resources of this Basin for

the benefit of all authorized users in the Basin pursuant to the Congressionally authorized

purposes of the federal reservoirs in the ACF Basin and other applicable federal law. Alabama

has a sovereign and fiduciary duty as a trustee of the natural resources of the ACF Basin to

conserve and protect those resources from unlawful and unauthorized mismanagement by the

Corps, and a sovereign and fiduciary duty to protect the interests of its citizens from the impacts

of the Corps' unlawful conduct.

19.     The Coosa and Tallapoosa Rivers originate in north Georgia and flow southwest

into Alabama, where they eventually converge to form the Alabama River. Alabama owns

property in the ACT Basin and riparian to the Coosa and Tallapoosa Rivers, and citizens of

Alabama have an interest in and use and enjoy the waters of the ACT Basin. The ACT Basin

includes numerous counties in Alabama, including several that are located within the

geographical jurisdiction of the Northern District of Alabama, and represents a vital natural

resource for these counties as well as the State of Alabama and its citizens as a whole. In

particular, the Coosa River, which is specifically at issue in this action and is heavily impacted

by the operation of federal projects controlled by the Corps, flows through the Eastern Division

of the Northern District of Alabama, and a substantial part of the property that is at issue in this

case is located in the Eastern Division of the Northern District of Alabama. These counties and

their citizens have valuable economic, property, recreational, riparian, and environmental

interests that are dependent upon the Corps' neutral and objective management of Lake

8

Allatoona, Carters Lake, and other federally-owned reservoirs in the ACT Basin in a manner consistent with the Congressionally authorized purposes of those reservoirs and other applicable law. In addition to its continuous and ongoing operation and management of the federally owned reservoirs in the ACT Basin, the Corps has approved (or is in the process of reviewing several permit applications for) projects in the ACT Basin, including, but not limited to, the Hickory Log Creek Reservoir upstream of Lake Allatoona and the West Georgia Regional Reservoir on the Tallapoosa River system immediately upstream of the Alabama border. The Corps' discrete actions and failures to act have breached and will continue to breach its specific statutory and regulatory duties to maintain the environmental, ecological, and economic qualities and resources of this Basin for the benefit of all authorized users in accordance with the Congressionally authorized purposes of the federal projects in the ACT Basin. Alabama has a sovereign and fiduciary duty as a trustee of the natural resources of the ACT Basin to conserve and protect those resources from unlawful and unauthorized mismanagement by the Corps, and a sovereign and fiduciary duty to protect the interests of its citizens from the impacts of the Corps' unlawful conduct.

20.     Though the ACF and ACT Basins are separate and independent hydrologic systems, they are now linked by man-made inter-basin transfers, which are facilitated by the Corps' actions. Water stored by the Corps is withdrawn in Georgia from one Basin, used, and discharged as wastewater into the other. Alabama alleges on information and belief that these inter-basin transfers within the State of Georgia are facilitated by the Corps and result in a net outflow from the ACT Basin into the ACF Basin. The amount of this outflow is highly variable and difficult to quantify with precision, but Alabama alleges that the net transfer from the ACT Basin to the ACF Basin has steadily increased during recent years. Because of the substantial and

9

increasing inter-basin transfer from the ACT to the ACF, the Corps' management and operation of federal reservoirs in the ACF impacts the waters of the ACT Basin. Because waters from the ACT and ACF Basins are subject to inter-basin transfer, the Corps' water management decisions and operations of the federal reservoirs in these Basins are interrelated and factually linked.

21. The Corps has been authorized to develop and operate certain reservoir projects within the ACF and ACT Basins, subject to the requirements of specific statutes and regulations, including the Water Supply Act of 1958, 43 U.S.C. § 390(b), the Flood Control Act, 33 U.S.C. § 708, the Water Resource Development Act of 1988, 33 U.S.C. §2312, the National Environmental Policy Act of 1969, 42 U.S.C. §4321 et seq. ("NEPA"), and the Endangered Species Act, 16 U.S.C. §1536 (a)(2) ("ESA"). Congress authorized the Corps to develop Lake Lanier in the Rivers and Harbors Act, July 24, 1946, ch. 595. The Congressionally authorized purposes of Lake Lanier were and are hydropower, flood control, and navigation. The Congressionally authorized purposes of Lake Allatoona are hydropower, flood control, and navigation. The Congressionally authorized purposes of Carters Lake are hydropower, flood control, and navigation.[2] The Corps is responsible for operating and maintaining these reservoirs consistent with federal law and their Congressionally authorized purposes.

22. The ACF and ACT Basins are home to numerous endangered and threatened species, including but not limited to numerous species of federally-protected mussels. On July 1, 2004, the United States Fish & Wildlife Service designated large portions of the ACT Basin as critical habitat for numerous species of endangered and threatened freshwater mussels. In identifying the biological and physical parameters essential to the conservation of the endangered and threatened mussel species in the ACT Basin, the Fish & Wildlife Service specifically

---

[2] The Corps also operates other reservoirs in the ACF and ACT Basins that are directly impacted by its operations of the upstream projects at Lanier, Allatoona, and Carters.

identified issues of water quality and water quantity. Alterations to the minimum flow in the designated areas or to the existing flow regime are specifically recognized as actions that might appreciably impact the long-term survival and recovery of the threatened and endangered species.

23.     On January 31, 2006, in connection with its claims in this lawsuit, plaintiff-intervenor the State of Florida filed before this Court a Motion For Preliminary Injunction on Endangered Species Act Claims. See Doc. 382. As part of that Motion, Florida sought an order "[d]irecting the Corps to consult formally with the U.S. Fish and Wildlife Service ("FWS"), pursuant to ESA Section 7(a)(2) . . . . regarding the impact of the Corps' discretionary ACF dam and reservoir operations . . . ." In response to Florida's Motion, the Corps formally requested that the FWS initiate consultation under the ESA on March 7, 2006. The Corps and FWS began formal consultation under the ESA shortly thereafter, and on September 5, 2006, the FWS issued a Biological Opinion on the impact of the Corps' operation of federal reservoirs in the ACF Basin on four federally protected species: the gulf sturgeon and three species of freshwater mussels (purple bankclimber, fat three-ridge, and Chipola slabshell). The Biological Opinion issued by FWS has important legal and practical implications for the Corps' operation of the federal reservoirs in the ACF Basin, including Lake Eufaula and West Point Lake, in which the State of Alabama has important sovereign interests.

## STATUTORY AND REGULATORY REQUIREMENTS

24.     Congress has not empowered the Corps to operate and manage the federal reservoirs in the ACT and ACF Basins in any manner it sees fit. Rather, Congress has established the purposes for which those reservoirs were funded, constructed, and for which they must be operated. Furthermore, Congress has passed several laws which limit the Corps' ability to operate and manage such reservoirs in a manner that abandons, re-orders, or significantly

11

affects those project purposes. Any of the Corps' final actions that exceed its authority or violate federal statutes and implementing regulations are reviewable under the Administrative Procedure Act as agency action otherwise not in accordance with law.

**Authorized Project Purposes**

25.   In 1946, Congress authorized the Corps to develop Buford Dam and Lake Lanier. Pub. L. No. 525, ch. 595 (July 24, 1946). Buford Dam and Lake Lanier were substantially completed in 1956, although the reservoir did not fill to full power pool until May 1959. Congress authorized Buford Dam and Lake Lanier for the purposes of flood control, navigation and hydropower. See U.S. Army Corps of Engineers, Apalachicola River Basin Reservoir Regulation Manual, Appendix B, Buford Reservoir, Chattahoochee River, Georgia (Dec. 1959), at B-6. Consistent with the scope of the Congressionally-authorized purposes, no storage was or ever has been allocated in Lake Lanier for municipal and industrial water supply purposes or recreation.

26.   In 1941, Congress authorized construction of Lake Allatoona. See House Document 674, 76th Congress, 3d Session. The authorized purposes of the project were and are flood control, hydropower production, and low flow augmentation for navigation. No storage for recreation has ever been allocated in Lake Allatoona, and only a very limited amount of storage in Lake Allatoona has ever been reallocated to water supply.

27.   In 1945, Congress authorized construction of Carters Lake. See House Document 414, 77th Congress, 1st Session, River and Harbor Act 2 Mar 1945. The authorized purposes of the project were and are flood control, hydropower production, and low flow augmentation for navigation. No storage for water supply or recreation has ever been allocated in Carters Lake.

**Water Supply Act And Implementing Regulations**

28. Congress declared in 43 U.S.C. § 390b(d), enacted as part of the Water Supply Act of 1958, Pub. L. No. 85-500, Title III, § 301(d):

> Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section [for municipal and industrial purposes] which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law.

29. Paragraph 3-8(b)(5) of ER 1105-2-100 (at 3-33-34) elaborates on the restrictions on reallocation and addition of storage in a Corps project imposed by 43 U.S.C. § 390b(d):

> Reallocation of storage. Reallocation or addition of storage that would seriously affect other authorized purposes or that would involve major structural or operational changes requires Congressional approval. Provided these criteria are not violated, 15 percent of the total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less, may be allocated from storage authorized for other purposes. Or, this amount may be added to the project to serve as storage for municipal and industrial water supply at the discretion of the Commander, USACE. When reallocating storage from the flood control pool to municipal and industrial water supply, the need to compensate existing water supply contract holders shall be evaluated. Dependable yield mitigation storage (DYMS) shall be analyzed and implemented to compensate these users.

30. Paragraph E-57(e) of ER 1105-2-100 (at E-219 et seq.) sets forth the "procedures and requirements for implementation of the DYMS analysis." Paragraph E-57(d)(1) of ER 1105-2-100 (at E-215-16) establishes the prerequisites for reallocation of storage over and above any requirement of Congressional approval:

> Approval Authority. Reallocation or addition of storage that would have a severe effect on other authorized purposes or that would involve major structural or operational changes requires Congressional approval. Providing the above criteria are not violated, 15 percent of total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less, may be allocated from storage authorized for other purposes or

may be added to the project to serve as storage for municipal and industrial water supply at the discretion of the Commander, USACE. For reallocations up to 499 acre-feet the Commander, USACE has delegated approval authority to the Division commanders. Reallocations which exceed the Commander's authority may be approved at the discretion of the Secretary of the Army if such reallocations do not require Congressional approval as described above. All reallocations or additions of storage should be to serve immediate needs. All reallocations or additions of storage must be accompanied by a report that includes:

(a) Purpose of the report and Background, including map

(b) Pertinent project data table

(c) Water supply needs analysis

(d) Test of financial feasibility

(e) Cost of storage analysis

(f) Analysis of alternatives considered to address the water supply needs

(g) Appropriate NEPA documentation of environmental impacts

(h) Pertinent letters from affected Federal, state and local interests, including documentation of public review and comment. Opportunities for public review and comment must be provided.

(i) Commander's recommendation

31. The Corps also stated in engineer pamphlet EP 1165-2-1 (July 30, 1999), that Congress must authorize reallocation of storage in an existing project where the proposed reallocation would severely affect the project. Paragraph 18-2(a) (at 18-1) of that document cautioned that modification of existing projects to include storage for municipal and industrial purposes "which would severely affect the project, its other purposes, or its operation, requires Congressional authorization." Again in ¶ 18-2(c) (at 18-1-2) of that pamphlet, the Corps declared: "Reallocation of reservoir storage that would have a significant effect on other authorized purposes or that would involve major structural or operational changes requires

14

Congressional approval."

### Regulations Governing Corps Operation and Management

32.    Congress provided in 33 U.S.C. § 709:

On and after December 22, 1944, it shall be the duty of the
Secretary of the Army to prescribe regulations for the use of
storage allocated for flood control or navigation at all reservoirs
constructed wholly or in part with Federal funds provided on the
basis of such purposes, and the operation of any such project shall
be in accordance with such regulations . . . .

33.    The Corps promulgated 33 C.F.R § 222.5, which "prescribes policies and

procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control

management activities, including establishment of water control plans for Corps and non-Corps

projects, as required by Federal laws and directives." 33 C.F.R § 222.5(a). This set of

regulations applies to "all field operating activities having civil works responsibilities," 33

C.F.R. § 222.5(b), including the Corps projects in the ACF and ACT Basins.

34.    The Corps must prepare a "water control plan" for "reservoirs, locks and dams,

reregulation and major control structures and interrelated systems to conform with objectives and

specific provisions of authorizing legislation and applicable Corps of Engineers reports." 33

C.F.R. § 222.5(f)(1). "Water control plans include coordinated regulation schedules for

project/system regulation and such additional provisions as may be required to collect, analyze

and disseminate basic data, prepare detailed operating instructions, assure project safety and

carry out regulation of projects in an appropriate manner." 33 C.F.R. § 222.5(e)(1). "There can

not be a continuing or recurring deviation from approved water control plans. In the case of a

continuing or recurring change, the water control plan must be changed and the required

approval obtained from HQUSACE." ¶ 18-2(f) of the Corps' engineer pamphlet EP 1165-2-1 (at

18-4) (July 30, 1999). "The term 'reservoir regulation schedule' refers to a compilation of

operating criteria, guidelines, rule curves and specifications that govern basically the storage and release functions of a reservoir. In general, schedules indicate limiting rates of reservoir releases required during various seasons of the year to meet all functional objectives of the particular project, acting separately or in combination with other projects in a system." 33 C.F.R. § 222.5(e)(2). Water control plans must be "clearly documented in appropriate water control manuals." 33 C.F.R. § 222.5(f)(3). Corps requirements further provide that "[n]ormally, the control of a multiproject system requires an integrated water control plan whereby projects are regulated jointly in order to achieve the overall river basin management objectives. In such cases a master water control manual is prepared to define system regulation." EM 1110-2-3600 at 2-3 (Nov. 30, 1987).

35.     The Corps must develop water control plans "in concert with all basin interests which are or could be impacted by or have an influence on project regulation. Close coordination will be maintained with all appropriate international, Federal, State, regional and local agencies in the development and execution of water control plans." 33 C.F.R. § 222.5(f)(9); see also EM 1110-2-3600 at 2-1 (Nov. 30, 1987).

36.     The Corps must prepare a "water control manual" for all reservoirs under its supervision regardless of the purpose or size of the project, and for all lock and dam, reregulation and major control structure projects that are physically regulated by the Corps. 33 C.F.R § 222.5(i)(2). A "water control manual" refers to "manuals that relate primarily to the functional regulation of an individual project or system of projects." 33 C.F.R. § 222.5(i)(1). Each water control manual must contain "a section on special regulations to be conducted during emergency situations, including droughts." 33 C.F.R. § 222.5(i)(5). "Water control plans . . . documented in . . . water control manuals . . . .will be revised as necessary to conform with changing

16

requirements resulting from developments in the project area and downstream, improvements in

technology, new legislation and other relevant factors, provided such revisions comply with

existing Federal regulations and established Corps of Engineers policy." 33 C.F.R. § 222.5(f)(3).

37.    Where there are several projects in a drainage basin with interrelated purposes, a

"Master Manual" must be prepared. 33 C.F.R. § 222.5(i)(2). The Corps' projects in the ACF

and ACT Basins, respectively, have interrelated purposes.

**The Corps' Obligations to Involve Public in Management Decisions**

38.    Congress has stated that environmental protection is one of the "primary missions

of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water

resources projects." 33 U.S.C. § 2316. Furthermore, Congress provided in 33 U.S.C. § 2312:

> Before the Secretary [of the Army] may make changes in the
> operation of any reservoir which will result in or require a
> reallocation of storage space in such reservoir or will significantly
> affect any project purpose, the Secretary shall provide an
> opportunity for public review and comment.

39.    In a similar vein, Congress mandated in 33 U.S.C. § 2319, enacted as part of the

Water Resources Development Act of 1990, Pub. L. No. 101-640, 104 Stat. 4604, 4639, Title III,

§ 310(b):

> The Secretary [of the Army] shall ensure that, in developing or
> revising reservoir operating manuals of the Corps of Engineers, the
> Corps shall provide significant opportunities for public
> participation, including opportunities for public hearings. The
> Secretary shall issue regulations to implement this section,
> including a requirement that all appropriate information materials
> relating to proposed management decisions of the Corps be made
> available to the public sufficiently in advance of public hearings.

40.    The Corps promulgated engineer regulation ER 1105-2-100 (April 22, 2000,

superseding ER 1105-2-100 (Dec. 28, 1990)) to provide "the overall direction by which Corps of

Engineers Civil Works projects are formulated, evaluated and selected for implementation. It

contains a description of the Corps of Engineers planning process, Corps of Engineers missions

and programs, specific policies applicable to each mission and program, and analytical

requirements. Its fundamental purpose is to describe the planning process in a straightforward,

plain-language manner." Id. ¶ 1-2 at 1-1. This regulation applies to "all HQUSACE elements,

and all USACE commands having Civil Works responsibilities." Id. ¶ 1-3 at 1-1.

41. The "regulation provides the requirements for conducting planning studies within

the U. S. Army Corps of Engineers Civil Works program." Id. ¶ 1-6 at 1-4. Appendix B to the

regulation "provides the requirements for public involvement, collaboration and coordination in

Civil Works planning studies." Id. ¶ 1-8 at 1-4. For example, ¶ B-7 (at B-6) declares that

"Division and District commanders shall coordinate civil works planning programs with State

and local governments in accordance with Executive Order 12372 (Intergovernmental Review of

Federal Programs) and 33 CFR 384 (Intergovernmental Review of the Department of Army

Corps of Engineers Programs and Activities)." Paragraph B-7(b) (at B-7) requires that "Division

commanders shall adopt such procedures as may be necessary to assure coordination is effected

with states in a manner consistent with 33 CFR 384 and the processes established by the

individual states." See also ¶ 3-8(b)(1) of ER 1105-2-100 (at 3-32) ("Potential encroachment on

the water rights of lawful downstream water users by the operation of water supply storage must

be carefully considered and coordinated with responsible State and local interests. . . . Nor

should the Corps become involved in resolving conflicts among water users concerning rights to

use stored water, but will look to responsible State agencies to resolve such conflicts.").

**Flood Control Act And Implementing Regulations**

42. Congress provided in 33 U.S.C. § 708:

> The Secretary of the Army is authorized to make contracts with
> States, municipalities, private concerns, or individuals, at such

18

prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the Department of the Army; *Provided*, That no contracts for such water shall adversely affect then existing lawful uses of such water. . . .

43.     The Corps, in ¶ E-57(b) of ER 1105-2-100 (at E-214-15), established the

restrictions under which contracts for "surplus water" could be entered:

> Surplus Water.
>
> (1)     Authority.  Under Section 6 of the Flood Control Act of 1944 [33 U.S.C. § 708], the Secretary of the Army is authorized to make agreements for surplus water with states, municipalities, private concerns, or individuals at such prices and on such terms as he may deem reasonable.  These agreements may be for domestic, municipal, and industrial uses, but not for crop irrigation, from surplus water that may be available at any reservoir under the control of the Department of the Army.
>
> (2)     Classification.
>
> (a)     Surplus water will be classified as either:
>
> (1)     water stored in a Department of the Army reservoir that is not required because the authorized use for the water never developed or the need was reduced by changes that occurred since authorization or construction; or
>
> (2)     water that would be more beneficially used as municipal and industrial water than for the authorized purpose and which, when withdrawn, would not significantly affect authorized purposes over some specified time period.
>
> (b)     An Army General Counsel opinion of March 13, 1986, states that Section 6 of the Flood Control Act of 1944 empowers the Secretary of the Army to make reasonable reallocations between different project purposes.  Thus, water stored for purposes no longer necessary can be considered surplus. In addition, the Secretary may use his broad discretionary authority to reduce project outputs, envisioned at the time of authorization and construction, if it is believed that the municipal and industrial use of the water is a higher and more beneficial use.  However, surplus water declarations citing use for higher beneficial purposes should be made with caution and only on a fixed period agreement for temporary use.  When the user desires long term use, a

permanent storage reallocation should be performed under the authority of the Water Supply Act of 1958, as amended [43 U.S.C. § 390b].

(3)     Requirements and Restrictions. Surplus water declarations will only be made when related withdrawals will not significantly affect authorized purposes. Surplus water agreements shall be accompanied by a brief letter report similar to reallocation reports and shall include how and why the storage is determined to be surplus. Surplus water agreements will normally be for small amounts of water and/or for temporary use as opposed to storage reallocations and permanent right to that storage. Normally, surplus water agreements will be limited to 5 year periods. Use of the Section 6 authority should be encouraged only where non-Federal interests do not want to buy storage because the need of the water is short term or the use is temporary pending the development of the authorized use. The views of the affected state(s) will be obtained, as appropriate, prior to entering into any agreement under Section 6. . . .

See also ¶ 3-8(b)(4) of ER 1105-2-100 (at 3-33); ¶ 18-2(d) of EP 1165-2-1 at 18-2-3).

44.     Likewise, the Corps does not have unfettered discretion to reallocate storage in federal reservoirs to recreational use where Congress has not allocated any project costs to storage.

45.     Paragraph 17-3(e) of EP 1165-2-1 (at 17-5) provides:

Reallocation of Reservoir Storage for Recreation. Many projects, including those for which recreation facilities may have been included under general provisions of the Flood Control Act of 1944, as amended, do not have separable storage costs for recreation. In these circumstances recreation is an authorized project purpose but it is secondary, as far as storage operation is concerned, to project functions for which the storage was formulated. Any reallocation of reservoir storage to provide more stable recreation levels that would have a significant effect on other authorized purposes, or that would involve major structural or operational change, requires Congressional authorization. Costs reallocated to recreation will be established as the highest of the benefits or revenues foregone, replacement costs, or the updated cost of the storage, will be treated as a separable cost, and will be subject to non-Federal cost sharing. (ER 1105-2-100).

46.     Congress has not allocated any storage to recreation in Lake Lanier, Lake

Allatoona, or Carters Lake. Therefore, the Corps has no authority to reallocate storage to recreation if that reallocation will significantly impact other authorized project purposes or require major changes in reservoir operations.

### The Corps' Obligation To Consider the Environmental Impact of Its Operation of Its Facilities Under NEPA

47.     The National Environmental Policy Act ("NEPA") "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Section 102 of NEPA, 42 U.S.C. § 4332(2)(C), requires every Federal agency to consider the environmental impact of any "major Federal actions significantly affecting the quality of the human environment . . . ." "Major Federal action" includes actions with effects that may be major and that are potentially subject to Federal control and responsibility. 40 C.F.R. § 1508.18.

48.     Section 102(2)(C) of NEPA, 42 U.S.C. §4332(2)(C), requires all federal agencies, including the Corps, to:

> Include in every recommendation or report on...major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on–
>
> (i)     the environmental impact of the proposed action,
>
> (ii)     any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii)     alternatives to the proposed action,
>
> (iv)     the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

49.     This detailed statement, which is required under NEPA before a major federal action significantly affecting the quality of the human environment may be undertaken, is called

an Environmental Impact Statement ("EIS"). If the Corps finds that an EIS is not required

because a proposed action will not significantly affect the quality of the human environment, the

Corps must at least prepare an Environmental Assessment ("EA") and properly make a finding

of "no significant impact," explaining the agency's decision. Id.; 40 C.F.R. §1501.4.

50.     Further, Section 102(2)(E) of NEPA, 42 U.S.C. §4332(2)(E), requires that the

Corps, as a federal agency, "study, develop, and describe appropriate alternatives to

recommended courses of action in any proposal involving unresolved conflicts concerning

alternative uses of available resources." This provision is independent of the standard triggering

preparation of an EIS, and is not limited to proposed major actions significantly affecting the

quality of the human environment.

51.     The Council on Environmental Quality ("CEQ") has promulgated NEPA

regulations at 40 C.F.R. Parts 1500-1508. These regulations are "applicable to and binding on

all Federal agencies" including the Corps. 40 C.F.R. § 1500.3. In addition, the Corps has

promulgated its own regulations implementing NEPA, which are published at 33 C.F.R. Part 230

(generally applicable to Corps operations) and 33 C.F.R. Part 325, Appendix B (applicable to

Corps regulatory programs).

52.     Under the CEQ regulations, a Federal agency is required to prepare an

environmental assessment of actions not categorically excluded from NEPA compliance,

providing sufficient evidence and analysis for determining whether the agency must prepare an

environmental impact statement. See 40 C.F.R. § 1508.9(a)(1); 33 C.F.R. § 230.10. Unless the

environmental assessment results in a finding of no significant impact, the agency must prepare

an environmental impact statement. 33 C.F.R. § 230.11. When an EA concludes with a Finding

of No Significant Impact ("FONSI"), the agency is required to explain why an action will not

22

have a significant impact on the human environment. 40 C.F.R. § 1508.13. Although the impact of a particular project may be inconsequential in and of itself, if the cumulative impact of a given project and other planned projects is significant when considered together, the overall impact of the project must be considered. See 40 C.F.R. § 1508.27(b)(7)). A "cumulative impact" is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. 1508.7.

53.     According to the Corps: "Actions normally requiring an EIS are: . . . (b) Proposed changes in projects which increase size substantially or add additional purposes; and (c) Proposed major changes in the operation and/or maintenance of completed projects." 33 C.F.R. § 230.6. Federal agencies are required to "integrate the NEPA process with other planning at the earliest possible time . . . ." 40 C.F.R. § 1502.2. Federal agencies are also required to engage in a "scoping" process "as soon as practicable" to determine the range of relevant issues related to a proposed action to be analyzed under NEPA. 40 C.F.R. § 1501.7; 33 C.F.R. § 230.12.

54.     Section 102 of NEPA, 42 U.S.C. § 4332(2)(E), also requires a Federal agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Until an agency completes its NEPA process and issues a record of decision, "no action . . . shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a); 33 C.F.R. § 230.22.

**The Corps' Obligation to Avoid Jeopardizing Federally-Listed Species or Adversely Modifying Critical Habitat**

55.     Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), requires federal agencies to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" which has been designated as critical. The definition of the term "action" is very broad and includes virtually all discretionary Corps activities. 50 C.F.R. §§ 402.02 and 402.03. For purposes of the ESA's mandates, the term "action" includes not only activities directly undertaken by federal agencies, but also federal contracts, permits, easements and other types of approvals. When the Corps operates its reservoirs or proposes to enter a contract or issue a permit, easement or other approval, the Corps must ensure that the proposed action complies with Section 7 of the ESA.

56.     Section 7 of the Endangered Species Act, 16 U.S.C. §1536, and regulations promulgated pursuant thereto, obligate every federal agency to, among other things:

(a)     ensure that any action it undertakes is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species unless such agency has been granted an exemption;

(b)     consult with the Secretary of Interior, prior to taking action, to determine whether such jeopardy or adverse modification is likely to occur if there is reason to believe that such impact might occur;

(c)     obtain an opinion ("biological opinion") from the Secretary following such consultation that details how the agency action affects the endangered or threatened species or its habitat and if jeopardy or adverse modification is found, what reasonable and prudent alternatives can be taken in implementing the agency action without causing such jeopardy or

adverse modification.

57. A federal action may not proceed if it would jeopardize the existence of a federally-listed species or destroy or adversely modify a federally-listed species' critical habitat, unless an exemption is granted under Section 7(h) of the ESA. Section 7(a)(2) imposes a procedural obligation on action agencies to "consult" with the United States Fish & Wildlife Service (or NOAA Fisheries in the case of marine species) to ensure that the federal action does not violate the ESA's substantive requirements.

58. During consultation, an action may proceed subject to two prohibitions. First, all actions (whether federal or non-federal) are subject to the prohibition against the "taking" of individual members of a listed species contained in Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(B). In addition, the federal agency is prohibited from making any "irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" which would avoid jeopardy. 16 U.S.C. § 1536(d).

**The Corps' Obligation to Avoid the Unauthorized "Take" of Listed Species**

59. Section 9 of the ESA, entitled "Prohibited acts," specifically identifies and proscribes a number of different activities, including: "(1) 'the take' of 'any [endangered] species within the United States . . . .'" 16 U.S.C. § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" with respect to federally-listed species. 16 U.S.C. §1532(19).

60. Section 9(g), 16 U.S.C. § 1538(g), provides that "[i]t is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense" defined in Section 9. The ESA defines "person" to include

"any officer, employee, agent, department or instrumentality of the Federal Government." 16 U.S.C. § 1532(13). Thus, the Corps is subject to the ESA's prohibition on take.

61.    If the Fish & Wildlife Service determines during Section 7 consultation that a proposed federal action will unintentionally take members of a listed species, the Service may provide the federal agency with an incidental take statement. 16 U.S.C. § 1536(b)(4) & (o). An incidental take statement authorizes the taking of members of listed species, notwithstanding the prohibition found in Section 9. If an action agency lacks an incidental take statement, however, any takings of listed species are unauthorized and violate Section 9's take prohibition.

**The FWS's Obligations Under the ESA to Consult and Prepare Biological Opinions**

62.    Section 7(a)(2) imposes an obligation to "consult" with FWS to ensure that agency action does not violate the ESA's substantive requirements. The procedural requirements of Section 7(a)(2) are designed to ensure agency compliance with the substantive provisions of the ESA.

63.    The consultation process under Section 7 of the ESA can be summarized as follows: The action agency (here the Corps) must initially evaluate the potential effects of an action that may affect listed or designated critical habitat. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12. If an endangered species may be present in the area of its proposed action, the ESA requires the action agency to prepare a biological assessment to determine whether the proposed action is likely to affect the species and therefore requires formal consultation with FWS. If the biological assessment demonstrates (or FWS concludes) that the proposed action is likely to adversely affect listed species or critical habitat, the agency must initiate formal consultation with FWS.  50 C.F.R. § § 402.14(a), (c).

64.    The "effects of the action" to be assessed by FWS include all direct and indirect

effects of an action on the species or critical habitat, along with cumulative, interrelated, and interdependent activities that will be added to the environmental baseline. The environmental baseline must include all past and present impacts of Federal, State, or private actions or activities in the action area. 50 C.F.R. § 402.02.

65. Formal consultations assess whether a proposed agency action is likely to "jeopardize" a listed species by reducing the likelihood of its survival and recovery, 50 C.F.R. §402.01, or to destroy or adversely modify designated critical habitat. 16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.10. An agency action is likely to jeopardize the continued existence of a species if the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. An agency action destroys or adversely modifies critical habitat if the action "appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." Id. This occurs if an agency alters "any of those physical or biological features that were the basis for determining the habitat to be critical." Id.

66. FWS issues a biological opinion at the conclusion of formal consultation, which must be based on the "best scientific and commercial data available," detailing how the agency action affects the species or its critical habitat. 50 C.F.R. § 402.02; *see also* 50 C.F.R. §§ 402.14(d), (g). If FWS finds that the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify the species' critical habitat, FWS must include in the biological opinion "reasonable and prudent alternatives" that the action agency can take to avoid a violation of Section 7. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5). If the FWS finds that the proposed action will not result in jeopardy but will result

in "incidental take" of members of protected species, it shall issue an incidental take statement in conjunction with its biological opinion, along with reasonable and prudent measures that the FWS considers necessary or appropriate to minimize such impacts. 50 C.F.R. § 402.14(i).

### The Administrative Procedure Act

67. The Corps' operation and management of the federally owned dams, reservoirs, and related facilities in the ACF System is subject to the procedural requirements of the Administrative Procedure Act ("APA"), at 5 U.S.C. § 551, et seq. Specifically, the APA establishes public participation requirements and notice-and-comment procedures that all federal agencies, including the Corps, must follow when undertaking rulemakings, adjudications or other agency decisions that result in agency action. 5 U.S.C. § 553. "Agency action" includes the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

68. The APA also authorizes judicial review of agency action and inaction. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA provides that a reviewing court shall:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law . . . .

5 U.S.C. § 706.

### FACTS

**The Corps' Actions and Failures to Act With Respect To the Operation and**

**Management of Federal Reservoirs in the ACT and ACF Basins**

69.     Since the completion of the federally-owned reservoirs in the ACF and ACT

Basins, the Corps has consistently and repeatedly operated those federal projects in a manner

inconsistent with Congressional intent, federal law, and applicable regulations. Rather than

operate and manage those reservoirs to meet their Congressionally authorized project purposes,

the Corps has consistently and repeatedly used them to satisfy upstream demands for water

supply, drought protection, and recreation.  The Corps' discrete actions, decisions, and failures to

act in each Basin, as further described below, have included final dispositions of various matters,

the granting of permission or assistance to various persons, and the taking of actions on the

application or petition of, and beneficial to, various persons, or the equivalent thereof, and

therefore constitute final agency actions subject to review under the APA, as further described

below.

70.     Since at least the early 1980s, the Corps has operated Lake Lanier and Lake

Allatoona for water supply for metropolitan Atlanta and recreation for the Atlanta area.  The

Corps' operations at these reservoirs have been taken pursuant to a number of discrete and final

agency actions, and in accordance with management decisions of general applicability to both

reservoirs.  For example, since the development of Lake Lanier, the Corps has entered into a

series of contracts with municipalities and other political subdivisions in the State of Georgia

permitting those entities to store and withdraw millions of gallons of water per day ("MGD")

from the conservation storage portion of the project for Municipal and Industrial ("M&I" or

simply "water supply") use.  These contracts are more fully described in paragraphs 66, below.

Furthermore, by at least 1986, the Corps had devised, developed, and implemented an unlawful

and unauthorized "river management system," sometimes referred to as the "Upper

Chattahoochee River Management Plan," expressly designed to control the operation of Lake Lanier to maximize that reservoir's water supply, water quality, and recreation for metropolitan Atlanta. Under this system, the Corps has agreed to tailor its operations to provide only those releases from Lanier necessary to satisfy the Atlanta Regional Commission's water withdrawals and the minimum flow required to assimilate the wastewater discharges from the Atlanta metropolitan area. The Corps consults with ARC at least weekly to determine the amount of water to release from storage in Lake Lanier in accordance with this agreement. Moreover, the Corps agreed to provide ARC with 327 MGD from Lake Lanier free of charge as part of that agreement. All remaining water is (and has been) held in the reservoir for the sole benefit of recreation and water supply. All other authorized uses, including hydropower and navigation, were and are wrongfully deprived of massive amounts of water otherwise available to support those uses. Alabama alleges that the Corps adopted and instituted this unlawful system without any review under NEPA or other applicable law and regulation. The Corps has operated Lake Lanier in this manner at all times relevant to this lawsuit, and the Corps continues to operate Lake Lanier under this unlawful system today. The Corps' implementation of the "Upper Chattahoochee River Management Plan" for operation of Lake Lanier constitutes the culmination of the Corps' decision-making process, and is a final agency action granting a right or relief that is subject to judicial review under the APA.

71. As of 1956, Congress had already determined that there was no surplus water in Lake Lanier. In the years after the reservoir was completed, the Corps executed two "relocation contracts" authorizing the withdrawal of water for municipal and industrial purposes from Lake Lanier by the cities of Buford and Gainesville, both of which had withdrawn water from the area eventually inundated by Lake Lanier. The Buford contract was executed on December 19, 1955.

The contract provided for the withdrawal of 2 million gallons per day ("MGD") from Lake Lanier. The contract required the execution of a new contract if Buford desired to exceed that limit. On information and belief, the Buford contract has not been modified and remains in effect. However, Buford has requested that the contract be modified to more than double authorized withdrawals. The Gainesville contract was executed on June 22, 1953. That contract provided for the withdrawal of not more than 8 MGD from Lake Lanier. That contract was superseded on May 28, 1987 by an interim water withdrawal contract, Contract No. DACW01-9-85-224. The new contract granted a "privilege" to withdraw 20 MGD from Lake Lanier. The contract was terminable by either party on 6 months notice. The contract provided that the water withdrawn was to be used in a manner "consistent with Federal laws." The contract terminated on January 1, 1990 by virtue of an August 3, 1989 "supplement" which provided for its termination as of January 1, 1990. In December 2002, the Corps attempted to resurrect the expired Gainesville contract by executing a new water supply contract with Gainesville, which became part of the Settlement Agreement in the D.C. Litigation, as more particularly described below. Exhibit D to the settlement agreement was styled "Supplemental Agreement to Relocation Contract between the United States of America and the City of Gainesville for Withdrawal of Water from Lake Sidney Lanier, Georgia." The new contract purports to authorize withdrawals from Lake Lanier up to 18 MGD. Although the initial contract expired, Gainesville was allowed by the Corps to continue to withdraw water between 1990 and 2002 in ever increasing amounts until execution of the 2002 contract (which was subsequently enjoined by this Court as part of the Settlement Agreement). The Corps currently authorizes and facilitates through its daily reservoir operations the withdrawal of water from Lake Lanier by Gainesville as if the new Gainesville contract were lawful. Each day that the Corps continues to

authorize and facilitate the withdrawal of water from Lake Lanier by Gainesville, whether under the terms of the 2002 contract or otherwise, constitutes an individual, discrete, discretionary action, which among other things constitutes "final agency action" for purposes of review under the APA.

72. Beginning in 1973, the Corps entered into a series of additional contracts with municipalities and other political subdivisions in the State of Georgia permitting those entities to withdraw, and providing for the Corps' release of, millions of gallons of water per day for municipal and industrial use from conservation storage in Lake Lanier. By 1986, the Corps had entered into additional water supply contracts or agreements with the City of Cumming, Georgia; Gwinnett County, Georgia; and the Atlanta Regional Commission ("ARC") (collectively, along with the cities of Buford and Gainesville, the "Georgia water supply providers"). By 1988, the Corps had entered into withdrawal or storage contracts or agreement with the City of Cumming, Georgia, the City of Gainesville, Georgia, the City of Buford, Georgia, Gwinnett County, Georgia, and the Atlanta Regional Commission (collectively, the "water supply providers") in amounts equaling 462 million gallons per day ("MGD"). In addition, there were also proposals to enter into contracts allowing withdrawals for M&I use in two categories: withdrawals directly from the Lake Lanier and withdrawals from the Chattahoochee River, projected to be 150.96 MGD and 378.40 MGD, respectively, by 2010. The withdrawals from the Chattahoochee River were and are directly supported by the Corps' operations of Lake Lanier. Total contract average day withdrawals were thus projected to be 529.36 MGD.[3]

73. Beginning in 1986, the Corps has continuously allowed withdrawals from Lake Lanier that exceed the maximum withdrawal of 50,000 acre-feet per day established by Corps

---

[3] In contrast, the total withdrawals allowed under the Settlement Agreement are 537.4 MGD.

regulations, provided that the other requirements of the Water Supply Act are met. By the end of the calendar year 1989, many of the withdrawal contracts described above had expired. In each instance, however, the Corps has allowed such M&I withdrawals and releases to continue unabated and without interruption, under the moniker "holdover contracts," and has acquiesced in increases in the amount of storage reserved for those withdrawals and increases in the releases of water from Lake Lanier to support M&I uses by water supply providers in the Atlanta metropolitan area. Alabama alleges that the parties have continued to perform under these contracts or agreements, and that these contracts have been modified, extended, and renewed by implication, agreement (express or implied) and/or course of performance. Today, the Corps is allowing M&I withdrawals from Lake Lanier far in excess of the amounts specified by any contract. Alabama alleges that the Corps' decisions to allow continuing withdrawals from the federal reservoirs in the ACT and ACF Basin under the "holdover contract" theory were made pursuant to discrete agreements with various water supply entities and constitute licenses, privileges, relief, or the equivalent thereof and are final agency actions reviewable under the APA. On information and belief, Alabama alleges that the Corps is currently allowing withdrawals from the ACT and ACF Basins pursuant to the following contracts, or, to the extent that the contracts have expired, "holdover contracts" on substantially the same terms but for greatly increased amounts of water:

Lake Allatoona, Georgia (ACT Basin)

City of Cartersville Georgia: Contract No. DACW01-67-RE-0002 dated July 12, 1966, for 1,996 acre feet of storage space (0.70% of conservation pool storage) needed to yield an avenge of 5.26 million gallons per day (mgd) during critical drought periods.

City of Cartersville, Georgia: Contract No. DACW0I-9-91-l20 dated October 18, 1991, for 4,375 acre feet of storage space (1.54% of conservation pool storage) needed to yield an average of 11.5 mgd during critical drought periods.

City of Cartersville's combined storage allocation: The total of the two contracts above reallocates to water supply 6,371 acre feet of storage space (2.24% of conservation pool storage) needed to yield an average of 16.76 mgd during drought periods. In 1998 the average daily withdrawal was 12.82 million gallons.

Cobb County-Marietta Water Authority: Contract No. DA-01-076.. CIVENG-64-116 dated October 10, 1963, for 13,140 acre feet of storage space (4.61% of conservation pool storage) needed to yield an average annual 34.5 mgd during critical drought periods. In 1998 the average daily withdrawal was 46.69 million gallons.

Combined Storage Allocations From Allatoona Lake: The total of the three contracts above allocates to water supply 19,511 acre feet of storage (6.85% of the conservation pool storage) needed to provide a dependable yield of an average annual 51.26 mgd during critical drought periods. The combined average withdrawal from the lake during 1998 was 59.51 mgd.

      Carters Lake, Georgia ACT Basin)

City of Chatsworth, Georgia: Contract No. DACW01-9-91-481 dated November 15, 1991, for 818 acre feet of storage (0.61% of the conservation pool storage) needed to yield an average of 2.0 mgd per annum during drought periods. In 1998, the average daily withdrawal was 1.19 million gallons.

      Lake Sidney Lanier, Georgia (ACF Basin)

City of Gainesville, Georgia. Relocation Contract Agreement dated June 22, 1953: allows the City to withdraw up to 8 mgd of water per day with no charge. This agreement was replaced with the Contract No. DACW-01-9-85-224 when the City began to exceed its 8 mgd free withdrawal allowance.

City of Buford, Georgia Relocation Contract No. DA-CW-076-CIVENG-56-419 dated December 19. 1955: allows the City to withdraw up to 2 mgd of water per day with no charge. Its average daily withdrawal during 1998 was 1.18 million gallons.

Gwinnett County, Georgia. Water Withdrawal Contract No. DACW01-9-73-624 dated July 1, 1973, as amended: This contract allows the County to withdraw up to an average of 53 mgd per annum from the lake. The County continues to withdraw water and pay the Government on a per million gallon basis under the provisions of the interim withdrawal contract. The County's average daily withdrawal during 1998 was 83.18 million gallons.

City of Cumming, Georgia. Water Withdrawal Contract No. DACW01-9-77-1096 dated June 27, 1978, as amended: This contract allows the City to withdraw up to an average annual amount of 10mgd. The City's average daily withdrawal rate during 1998 was 10.51 million gallons. The City of Cumming supplies the water supply needs of Forsyth County, Georgia. Presently, Forsyth County has no contact with the U. S. Army Corps of Engineers to make water supply withdrawals from Lake Lanier.

City of Gainesville, Georgia. Water Withdrawal Contact No. DACW01-9-85-224. dated May 28, 1987, as amended. This contract replaces the relocation contract agreement dated June 2, 1953, and allows the City to withdraw up to 20 mgd per annum. It has been allowed to deduct metered return flows from its waste treatment systems. In 1998, gross withdrawals were 15.84 mgd and metered returns were 9.13 mgd, leaving a net withdrawal of 6.71 mgd.

Atlanta Regional Commission, Water Withdrawal Contract No. DACW01-9-86-145: In the contract, ARC is the agent for the City of Atlanta, and for Cobb, Dekalb, Fulton and Gwinnett Counties (the principals). This contract acknowledges that special releases, over those made for hydropower generation, from Lake Lanier might be necessary to meet the downstream water withdrawal needs of the ARC principals. It was estimated that normal peak power releases would, on average, provide for 327 mgd river withdrawals, but the contract provided for a peak withdrawal of 377 mgd. Charges are assessed on a per mgd basis for withdrawals which exceed 327 mgd. During 1998, the avenge daily withdrawal from the river was 273.63 million gallons and the peak day withdrawal was 393.54 million gallons.

Alabama alleges that the Corps has allowed these withdrawals to continue in excess of the five year "temporary" period for surplus water withdrawals under the Flood Control Act, and that the Corps is required to either execute permanent storage contracts pursuant to the requirements of the Water Supply Act and other applicable laws and regulations or cease withdrawals. Alabama alleges that the Corps' execution of these contracts and its continuing grant of license, privilege, or relief to withdraw water under these contracts, amendments, subsequent agreements, or "holdover contracts" on substantially the same terms are discrete, final agency actions reviewable under the APA. Alabama alleges that each time the Corps allows the withdrawals describes above constitutes a discrete and final act which marks the culmination of the Corps' decision-making process and which has immediate legal consequences.

74. Recognizing that it lacked the authority or discretion to continue allowing withdrawals under these contracts for water supply, in October 1989 the Mobile District of the Corps issued a draft Post Authorization Change report for Lake Lanier in order to convert the interim withdrawal contracts to permanent water storage contracts. In the 1989 report, the Corps

proposed to re-allocate large portions of the storage in Lake Lanier for water supply;
contemplating storage sufficient to support the average withdrawal of approximately 336 MGD
for existing uses with projected increased average daily uses of up to 529 MGD by 2010. The
Corps prepared this report with the express purpose of seeking Congressional authorization, as
required by statute, for the reallocation of water storage necessary to serve the increased M&I
water withdrawals for the water supply providers. The report has since been withdrawn and no
Congressional authorization has been sought. The Corps has nonetheless continued to provide
from Lake Lanier an ever increasing amount of water for M&I purposes, substantially in the
manner anticipated in the report, with amounts being supplied approximating 430 MGD in 1999.
The sum of the 1999 peak day withdrawals for the water supply providers was approximately
591 MGD, which represents approximately 62% of the available yield of the reservoir (as
currently calculated by the Corps). In effect, the Corps has taken actions and made management
decisions that accomplish substantially the same thing they proposed in the 1989 PAC Report
without following the proper procedures, obtaining Congressional approval, or conducting the
environmental analysis and public review required by applicable federal law and regulations.
Alabama alleges that the Corps has a discrete, non-discretionary duty to seek Congressional
authorization prior to taking these actions, and that its failures to seek Congressional approval for
these actions are discrete, mandatory agency actions unlawfully withheld and subject to review
under the APA. Alabama further alleges that the Corps' actions in this regard are grants of
license, privilege, or relief that mark the culmination of the Corps' decision-making process and
which have immediate legal consequences. Alabama further alleges that the Corps' actions as
described above have been guided by a policy decision to elevate water supply and recreation
above all other project purposes at Lake Lanier and Lake Allatoona, and that the Corps' decision

36

constitutes final agency action that is arbitrary, capricious, or otherwise not in accordance with law and subject to judicial review under the APA.

75.     The Corps has for many years allowed water suppliers in Georgia to withdraw more water from the ACT and ACF Basins than contemplated by those entities' contracts. For example, in the ACT, Cobb County-Marietta Water Authority withdrew an annual average of 50.29 MGD in 1999, when its contract only allowed for 34.5 MGD. In the ACF, Gwinnett County withdrew an annual average of 88.38 MGD in 1999; its (holdover) contract with the Corps only allowed for 53 MGD. The Corps' decisions to allow withdrawals in excess of any contract amounts (or in the absence of any valid contract) are discrete and final agency actions marking the culmination of the Corps' decision-making process, and the reduction of storage space available to support authorized project purposes has immediate legal consequences.

76.     The Corps has knowingly allowed these withdrawals in excess of the amounts contemplated by storage contracts to occur, and has allowed these excessive withdrawals to continue until the present day. There is no current justification or excuse for the Corps' decision to allow continuing withdrawals in excess of the contracted storage amounts and the maximum withdrawal levels established by Corps regulations and the requirements of federal law. The Corps' longstanding and continuing policy and practice of allowing water supply withdrawals from storage in the federal reservoirs in the ACT and ACF Basin in excess of contracted storage amounts (whether they be current or "holdover" contracts) demonstrates that the Corps has reached the culmination of its decision-making process on this issue. Furthermore, legal consequences flow from each of these unauthorized withdrawals because they reduce the amount of water available in storage and significantly impact other authorized uses. Accordingly, the Corps' actions and failures to act in this regard constitute final agency actions subject to review

under the APA.

77. Furthermore, the Corps has entered into contracts or agreements with the ARC to provide it with 327 MGD per day downstream of Lanier in addition to the minimum amount of flow (750 cfs) required to assimilate pollution entering the stream in the Atlanta area.[4] ARC does not pay the Corps anything for this water. On information and belief, Alabama alleges that the Corps has entered into contracts or agreements with ARC to allow additional withdrawals of 50 MGD from releases from Lake Lanier. Congress has never authorized an allocation of storage for this amount of water to satisfy ARC's water supply needs. The Corps' agreements to provide the ARC with this amount of water from storage in Lake Lanier, most of it free of charge, constitutes final agency actions subject to review under the APA.

### Corps Failure to Adopt and Follow Valid Operation Manuals

78. On information and belief, Alabama alleges that the Corps developed Water Control Plans and Reservoir Regulation Manuals for the ACF and ACT Basins in the 1950s. Specifically, the Corps developed a "Master Manual" for the ACT in 1952, and that document has never been revised. According to Corps documents, the Carters Lake manual was last revised in 1978, and the Allatoona manual was last revised in 1968. A "Master Manual" for the ACF was prepared in 1958, along with a Reservoir Regulation Manual for Lanier in 1959. These documents remained in place at least through the 1970s and 1980s. During this time the Corps consistently failed to operate the federally owned reservoirs at issue in this case in accordance with the terms of the applicable Master Manuals, Water Control Plans, and Reservoir Regulation Manuals. To the extent that the Corps contends that these manuals and plans are still operative and valid today, Alabama alleges that the Corps' operations for water supply and recreation as

---

[4] In reality, this 750 cfs is inadequate to ameliorate the chronic water quality problems that have plagued the Chattahoochee River and downstream reservoirs.

described herein violate the mandatory operational rules and directives set forth in those documents, which specify that the federal reservoirs in the ACT and ACF Basins shall be operated to support the Congressionally authorized project purposes of hydropower, navigation, and flood control.

79.     In the late 1980s and early 1990s, the Corps began efforts to significantly revise the Water Control Plans and Reservoir Regulation Manuals for the ACF and ACT Basins and the reservoirs at issue in this case. It appears that the Corps adopted an "interim" Water Control Plan for the ACF Basin in 1991, along with something similar for Lake Lanier (as an update to the 1959 document for Lanier). In 1993, the Corps developed a revision to the Allatoona "Water Control Manual." Alabama alleges that those documents have never been finalized and subjected to the appropriate review and coordination under federal law and the Corps' own regulations. As a result, the Corps has failed to take discrete, non-discretionary actions as required by law, and Alabama and its citizens have been denied any opportunity to participate in the Corps' management decisions that have wide-ranging impacts on vital natural resources in which Alabama and its citizens have direct and substantial interests. By contrast, the Corps coordinates weekly with the Atlanta Regional Commission and other entities from the Atlanta metropolitan area to determine how the federally owned reservoirs in the ACF should be operated. Alabama further alleges that to the extent these manuals and plans, including but not limited to the 1991 ACF "interim" Water Control Plan and the 1993 Allatoona "Water Control Manual," can be considered final and valid, they are inconsistent with and significantly affect the Congressionally authorized purposes of those reservoirs and have not been finalized pursuant to the procedures and processes mandated by applicable law and regulations.[5] In the alternative, Alabama alleges

---

[5] In fact, the 1993 Allatoona document expressly recognizes that navigation is an

that if the 1991 "interim" Water Control Plan and 1993 Allatoona "Water Control Manual" are final documents, then the Corps has failed to conform its operations to the mandatory requirements of those documents, including specific requirements for the minimum generation of hydropower.

80.    The Corps has a discrete, non-discretionary legal duty to promulgate rules and guidelines for the operation of federally owned reservoirs through public notice and comment procedures.[6]  On information and belief, Alabama alleges that, contrary to federal law and its own regulations, the Corps has not adopted final, up-to-date reservoir regulation manuals, water control plans, or master manuals for the federally-owned reservoirs in the ACT and ACF Basins. The Corps has a clear legal duty to promulgate and adopt such documents pursuant to federal law and applicable regulations, and its failure to do so constitutes discrete agency actions unlawfully withheld under the meaning of the APA.  To the extent the Corps purports to have developed final Water Control Plans for federal projects in the ACF and ACT Basins, Alabama alleges that the Corps has failed to comply with the procedures for developing and finalizing such plans mandated by federal law and regulations, including NEPA review, and that such plans are inconsistent with the Congressionally authorized purposes of the federal reservoirs in the ACT and ACF Basins.  In the alternative, Alabama alleges that if the 1991 "interim" Water Control Plan and 1993 Allatoona "Water Control Manual" are final documents, then the Corps has failed to conform its operations to the mandatory requirements of those documents, including specific requirements for the minimum generation of hydropower.

81.    Alabama further alleges that, at various times in the past and continuing to the

authorizing purpose for the project, but states that the project will not be operated to support navigation.

[6] See 33 C.F.R. § 222.5.

40

present day, the Corps has operated Lake Lanier, Lake Allatoona, and Carters Lake in a manner

inconsistent with any validly promulgated and approved Reservoir Regulation Manual.

Furthermore, the Corps has operated, and continues to operate, Lake Lanier without a valid

Reservoir Regulation Manual promulgated through notice and comment procedures as required

by applicable laws and regulations. To the extent that the Corps does have finalized Master

Manuals, Water Control Plans and Reservoir Regulation Manuals on the ACF and ACT Basins,

they are woefully outdated and the Corps has consistently operated the federally owned

reservoirs in those basins in a manner inconsistent with the mandatory guidelines set forth in

those governing documents. Rather, the Corps has operated, and continues to operate, under *ad*

*hoc*, unauthorized, and patently illegal guidelines and operating practices that have been

specifically developed to support water supply and recreation despite significant effects on the

Congressionally authorized purposes of the federal reservoirs at issue. As a result of the Corps'

unlawful, repeated and consistent failure to adopt and implement valid plans, or to comply with

the plans and manuals that are currently in place, Lake Lanier and other upper basin reservoirs

have been operated in a manner that significantly affects and impairs the Congressionally

authorized project purposes of downstream reservoirs, as well as the aesthetic, economic,

environmental, ecological, recreational, and property interests of downstream users.

### The Corps' Unlawful and Unauthorized Operation and Management of the Federal Reservoirs in the ACT and ACF Basins

82. At various times in the past and continuing until the present day, the Corps has,

through its management decisions, policies, actions, and failures to act, operated reservoirs in the

ACF and ACT Basin in a manner inconsistent with the Congressionally authorized purposes of

those reservoirs, in violation of applicable laws and regulations and in a manner contrary to any

valid Water Control Plan or Reservoir Regulation Manual. Specifically, the Corps has operated

certain reservoirs, including Lake Lanier and Lake Allatoona, in a manner that significantly and

severely affects the Congressionally authorized purposes of those reservoirs. The Corps'

unlawful operational decisions generally include, but are not limited to, 1) the decision (or

decisions) to systematically hold water in upstream reservoirs for recreational purposes and/or

drought protection for upper basin water supply at the expense of hydropower interests, to the

extent that more expensive power frequently has been purchased on the open market at times

when ample water remained in the hydropower pool; 2) the decision (or decisions) to

systematically hold water in upstream reservoirs for recreation and/or drought protection for

upper basin water supply when such water was needed to support downstream navigation; 3) the

decision (or decisions) to systematically hold water in upstream reservoirs for recreation and/or

drought protection for upper basin water supply when it was needed to support downstream

water quality; and 4) the decision (or decisions) to systematically permit, authorize, or otherwise

allow licenses or the equivalent thereof for the withdrawal of water for water supply from

storage in the federal reservoirs in the ACT and ACF Basins. In effect, the Corps has illegally

"re-authorized" federal projects in the ACT and ACF Basins by reallocating massive amounts of

storage for recreational uses and/or drought protection for upper basin water supply at the direct

expense  - and, in the case of navigation support from Lake Allatoona and Carters Lake,

complete abandonment - of other Congressionally authorized uses. The Corps' illegal and

unauthorized operations of the federal projects in the ACT and ACF are the result of conscious,

discrete decisions to give undue preference to certain users and uses in a manner that exceeds the

Corps' statutory authority and is inconsistent with applicable law and regulations. Alabama

alleges that the Corps' decision (or decisions) described above represent the culmination of the

Corps' decision-making process and have immediate legal consequences to the rights of all

downstream users, including the State of Alabama, and are therefore final agency actions reviewable under the APA. Alabama further alleges that the Corps has a discrete, mandatory, and non-discretionary duty to seek Congressional authorization before operating the federal reservoirs in the ACT and ACF in this manner, and that the Corps' failure to seek and secure the necessary Congressional approval is final agency action unlawfully withheld under the meaning of the APA.

83.     Alabama alleges that at various times in the past and continuing until the present day, the Corps has operated the federally owned reservoirs in the ACF and ACT Basin in a manner inconsistent with its legal obligations to operate these reservoirs as an inter-related system. The Corps has repeatedly and consistently held water available in upstream reservoirs without justification or authority and in direct contravention of the Congressionally authorized purposes of those reservoirs and the Corps' own regulations and operating guidelines, resulting in substantial impairment of existing, lawful, and authorized uses that support downstream flows, uses, and reservoirs. Furthermore, the Corps has violated federal law and its own regulations by failing to consider the downstream effects of allowing massive water supply withdrawals from upstream reservoirs. In fact, the Corps has modified its operation and management of downstream reservoirs in the ACF to compensate for and disguise its inability to meet its obligations in the basin as a result of its preferential management of Lake Lanier for upstream water supply and recreation. Similarly, the Corps' actions have necessitated alterations in the management and operation of downstream reservoirs in the ACT Basin to compensate for the Corps' unlawful operation of Lake Allatoona and Carters Lake. In addition, the Corps has failed to follow its own regulations and methodology for calculating the price that the Atlanta Regional Commission and others are required to pay for water supply storage. As a result, the Corps has

given the Atlanta Regional Commission and others preferential and unlawful pricing on water supply, which encourages waste and inefficient use of the resource and leads to higher costs for downstream users, including the citizens of Alabama. The Corps' consistent and repeated imposition of the burdens of metropolitan Atlanta's increased demand for water supply upon the State and citizens of Alabama in this manner is unauthorized and inconsistent with applicable laws and regulations and the Corps' obligations to administer public resources for the benefit of all members of the public. The Corps has neither the authority nor right to impose the burdens of metropolitan Atlanta's increased demand for water supply upon the State and citizens of Alabama in this manner absent express Congressional authorization. The Corps' actions, as more specifically described above, have been taken pursuant to operating policies and management guidelines that, while not adopted in accordance with applicable law and regulations, clearly mark the culmination of the Corps' decision-making process. These procedures and guidelines have been incorporated into various operating documents and are set forth as the applicable operating principles for these reservoirs on the Corps' website. Alabama further alleges that the Corps has a discrete, mandatory, and non-discretionary duty to seek Congressional authorization before operating the federal reservoirs in the ACT and ACF in this manner, and that the Corps' failure to seek and secure the necessary Congressional approval is final agency action unlawfully withheld under the meaning of the APA.

84.    In recent years, because of the Corps' decision to operate the federally owned reservoirs in the upper ACF and ACT Basins in a manner that fails to support all Congressionally authorized purposes, those river systems have been substantially and impermissibly impaired, strained, taxed and degraded. The Corps' systematic operation and management of Lake Lanier, Lake Allatoona, and Carters Lake for water supply and recreation have placed undue burdens on

44

downstream reservoirs. In fact, the Corps has abandoned the Congressionally authorized purposes of navigation support altogether in its operation of Lake Allatoona and Carters Lake. Similarly, rather than operate Lake Lanier to support downstream navigation on a consistent basis, the Corps has held water in Lake Lanier for recreation and water supply purposes while draining almost all of the available storage in lower reservoirs to support downstream navigation. The Corps has adopted a policy and practice of only releasing water to support downstream navigation during short and inadequate "navigation windows."[7] As a result, lower reservoirs have been impacted and navigation in the lower reaches of the ACF has become unreliable, if not impossible, for long periods of time and, predictably, economically valuable navigation traffic has been severely impeded. Downstream navigation, recreation, hydropower production, water quality, the riparian rights of Alabama and its citizens, and fish and wildlife habitat have suffered and are suffering substantial harm as a result of the Corps' continued and repeated acts and omissions. Alabama alleges that the Corps' decision (or decisions) described above have been set forth in a variety of internal documents and represent the culmination of the Corps' decision-making process and have immediate legal consequences to all downstream users, including the State of Alabama. Alabama further alleges that the Corps has a discrete, mandatory, and non-discretionary duty to seek Congressional authorization before operating the federal reservoirs in the ACT and ACF in this manner, and that the Corps' failure to seek and secure the necessary Congressional approval is final agency action unlawfully withheld under the meaning of the APA.

### Corps Specific Operational Policies and Management Decisions

---

[7] These "navigation windows" result in the release of large surges of water during a very short period of time. The Corps has never adequately assessed the environmental impacts of this practice under NEPA and other applicable federal laws and regulations.

85.    The Corps is, and has been, operating and managing the federally owned reservoirs in the ACF and ACT Basins in a manner that is arbitrary, capricious, and otherwise not in accordance with applicable laws and regulations.

86..    The Corps' illegal and unauthorized operation and management of the federal reservoirs in the ACT and ACF Basins is and has been effectuated by a series of discrete and final actions and failures to act in accordance with applicable laws and regulations.  At the most general level, the Corps' conscious and systematic decision to operate and manage the federal reservoirs in an unlawful manner is a discrete agency action subject to review under the APA. This decision is clearly reflected in numerous documents, and specifically in the Corps' agreement to operate Lake Lanier under the unlawful "river management system" discussed above.  Moreover, the finality of this decision is evidenced by the history of the Corps' operations:· the Corps has reached the culmination of its decision-making process regarding the operation of the federal reservoirs in the ACT and ACF Basins, and immediate legal consequences flow from implementation of its operational policies and management decisions. More specifically, the Corps' ongoing operation and management of the federal reservoirs in the ACF and ACT Basins is comprised of a series of discrete agency actions and decisions regarding when to release water from those projects and in what amounts.  Each time the Corps takes such an action is a discrete event marking the culmination of the Corps' decision-making process and with immediate legal consequences for downstream users, including the State of Alabama, and is therefore final agency action subject to review under the APA.

87.    Specific examples of the Corps' illegal, arbitrary, capricious, and unauthorized operations and management decisions in the ACT Basin include, but are not limited to the following:

46

a)    The Corps has made repeated decisions to curtail or abandon operations

for hydropower, navigation, water quality, downstream recreation, and fish and wildlife during

times of low flow in order to support upstream recreation and water supply. For instance, the

conservation pool at Lake Lanier is between 1035 and 1070 feet above sea level. However, the

lowest the water level in Lanier has ever dropped is 1052.66 feet above sea level – more than

seventeen feet above the top of the conservation power pool. Thus, over 44% of the available

conservation storage in Lake Lanier has *never* been tapped, even though hydropower,

downstream navigation, downstream water quality, and downstream recreation have suffered

severely from lack of releases from Lake Lanier. The Corps has candidly admitted that storage

in Lanier is not being fully utilized to support authorized project purposes because doing so

would be "politically" infeasible. Under the rules, policies, and operating guidelines currently in

place (whether or not formally adopted or subjected to public review as required by applicable

law and regulation), the Corps has ensured that the majority of storage in Lake Lanier will never

be used for any purpose other than recreation and water supply. As a result, in the drought of

2000, the reservoirs in the lower and middle reaches of the ACF Basin were depleted to levels

that approached (and sometimes reached) the very bottom of their conservation storage pools;

yet the lowest level recorded on Lake Lanier during that water year was 1058.6' feet above sea

level. The Corps' express and stated reason for refusing to release critically needed and

otherwise available water from the conservation pool is to support recreation in Lake Lanier and

provide drought contingency for Atlanta's water supply. The Corps has adopted this policy and

consistently applied it to its operations at Lake Lanier. Each time the Corps takes an action or

fails to act pursuant to this policy is a discrete event marking the culmination of the Corps'

decision-making process and with immediate legal consequences for downstream users,

47

including the State of Alabama, and is therefore final agency action subject to review under the APA. Alabama alleges that the Corps has reached the culmination of its decision-making process regarding the operation of Lake Lanier and that its decisions, and discrete actions implementing those decisions, are final agency action subject to review under the APA.

The instances where Lanier has been held at close to full pool while hydropower production and navigation have suffered are legion and well-documented. Taking only the most recent year as an example, from March 10, 2004 to September 8, 2004, navigable depth in the Apalachicola River did not rise above 6.84, but Lanier remained above 1069' for the same period. There was 34 feet of conservation storage left in Lanier during this entire period, but navigation received no support. In July 2004, navigable depth ranged from 3.96 feet to 6.84 feet and Lanier was above 1070.92' for the entire month. In fact, Lanier was very close to or above the top of the conservation pool for all of 2004.

The data for 2004 are not an aberration. For the entire 1980 to 1994 period, the 9-foot navigable channel was available only 54.5% of the time. Taking the 1985 water year as an example, the Congressionally authorized 9-foot channel was only available 55.1% of the time. However, Lanier was above 1070' from January through August, and at no time during 1985 did the elevation at Lanier drop below 1065.48'. There was never less than 30 feet of conservation storage in Lanier but navigation was only supported 55.1% of the time. Each and every occasion that the Corps decided not to release, or otherwise failed to release, water otherwise available to support navigation constitutes a final agency action in that it marked the culmination of the Corps' decision-making process and had immediate legal consequences to the State of Alabama.

The Corps has implemented similar operation and management decisions in the ACT. In fact, the Corps has specifically determined that Lake Allatoona will not be operated to support

navigation on the Alabama River, even though navigation support is one of the authorized project purposes of that reservoir. As a result, lower reservoirs in the ACT system (all located in Alabama) have been forced to supply a disproportionate share of the flows necessary to maintain the federally mandated navigable channel in the Alabama River. Like its decision to give undue preference to recreation at Lake Lanier, the Corps' refusal to utilize available storage at Allatoona to support navigation and other downstream interests exceeds its statutory authority and is arbitrary, capricious, and otherwise not in accordance with law.

The Corps has adopted this policy of favoring upstream recreation and water supply at the expense of Congressionally authorized purposes and has consistently applied it to operations at Lake Lanier, Lake Allatoona and Carters Lake. Each and every occasion that the Corps decided not to release, or otherwise failed to release, water otherwise available to support navigation, as evidenced by its own documents and reservoir level data, constitutes a final agency action in that it marked the culmination of the Corps' decision-making process and had immediate legal consequences to the State of Alabama. Alabama alleges that the Corps' has reached the culmination of its decision-making process regarding the operation of those reservoirs on each such occassion, that immediate legal consequences flow from each such decision (or decisions), and that each such decision (or decisions) constitute final agency action subject to review under the APA.

b) The only final and valid Water Control Plans, Reservoir Regulation Manuals, and "Master Manuals" ever adopted in the ACT and ACF Basins (all dating from the 1950s) require the Corps to operate the federal reservoirs in those basins for the Congressionally authorized purposes of hydropower, navigation support, and flood control. However, the Corps, on information and belief, continues to operate the federal reservoirs on the ACT and ACF

Basins under manuals, plans, and other governing documents that have not been validly

promulgated and approved pursuant to applicable law and regulation. As noted elsewhere in this

complaint, the Corps has a non-discretionary legal obligation to prepare and implement updated

governing documents. The Corps' failure to promulgate and implement the appropriate

operating documents for the reservoirs in the ACT and ACF Basins constitutes discrete,

mandatory, and non-discretionary agency action unlawfully withheld under the meaning of the

APA, and its *ad hoc* operations in the absence of valid manuals and plans are arbitrary,

capricious, and an abuse of agency discretion. In the alternative, Alabama alleges that the Corps

has consistently failed to operate the federal reservoirs in the ACT and ACF Basins according to

the mandatory and binding provisions of the only final and valid water control plans, reservoir

regulation manuals, and "master manuals" ever developed and adopted in the ACT and ACF

Basins. Each and every occasion that the Corps failed to operate in accordance with the

mandatory and binding provisions of the only final and valid water control plans, reservoir

regulation manuals, and "master manuals" ever developed and adopted in the ACT and ACF

Basins, as evidenced by its own documents and reservoir level data, constitutes a final agency

action in that it marked the culmination of the Corps' decision-making process and had

immediate legal consequences to the State of Alabama.

        c)      The Corps continues to operate under policies and management criteria,

either formal or informal, that ensure, to the greatest extent possible, that releases from Lanier

are limited to the amount of water required to meet Atlanta's water supply needs (a consumptive

use) and the absolute minimum amount of flow required to assimilate wastewater and other

pollution from the City of Atlanta (thereby assuring marginal water quality downstream). The

Corps has entered into an agreement (or agreements) with ARC and other water supply entities

in the Atlanta area that has come to be known as the "Chattahoochee River / Lake Lanier Management System." This agreement and the Corps' continuing operations in compliance with its terms constitutes final agency action, and violates federal law and the limits of the Corps' authority. Furthermore, this agreement was entered, and continues to be used to manage Lake Lanier, without any NEPA or other environmental analysis. In addition, Alabama alleges that the Corps regularly takes discrete and final agency actions by restricting releases from Lake Lanier to support water supply and recreation even though such operations have a significant effect on the Congressionally authorized project purposes of that reservoir. Each time the Corps takes such an action is a discrete event marking the culmination of the Corps' decision-making process and with immediate legal consequences for downstream users, including the State of Alabama, and is therefore final agency action subject to review under the APA.

        d)      The Corps has developed and implemented "action zones" for the ACF and ACT reservoirs that require operation to support upstream recreation and water supply by setting minimum hydropower release rates and maximum navigation release rates artificially low. These "action zones" are delineated in various manuals, plans and operating guidelines, whether or not valid, and, according to the Corps' website, are used to guide operations at the federal reservoirs in the ACT and ACF Basins today. What "zone" a reservoir is in depends on the elevation in the reservoir, and impacts how the Corps will operate the reservoir. For example, in Lanier, hydropower releases are reduced (basically to include only those releases necessary to supply the specified amount of drinking water needed downstream and the minimum amount of water required to dilute pollution from the Atlanta area) if the elevation dips into "zone two." The top of "zone two" is 1068' – only three feet below full pool.[8] Furthermore,

---

[8] It should be noted that Lanier was originally designed to operate at a full pool elevation

51

navigation support is reduced in zones two and three, and cut off altogether in zone four, which starts at elevation 1065'. When Lanier is at the top of zone four, approximately 80% of the available storage remains to support authorized project purposes. The Corps has set similar zones in Allatoona.

The Corps set these zones without following the procedures mandated by statute and regulation, without the public participation required by law, and without regard for their significant impacts on the Congressionally authorized purposes of these reservoirs. Furthermore, it does not appear that the Corps has undertaken any NEPA or ESA analysis to gauge the environmental impact of operating pursuant to these zones. The zones and the operating guidelines that they trigger constitute the culmination of the Corps' decision-making process, have immediate legal consequences and are a final agency action that is arbitrary, capricious, and otherwise not in accordance with law.

e)     The Corps has systematically operated Lake Lanier and Lake Allatoona for water supply and recreation despite significant impacts to hydropower, a Congressionally authorized purpose. The Corps has, at numerous and well-documented times in the past, refused to make releases from Lanier and Allatoona to meet or even partially meet system demands for hydropower. The impact of the Corps' refusal to release water from Carters, Lanier, and Allatoona for hydropower generation is magnified by the fact that lower reservoirs in both systems are also deprived of water that could be used to generate additional hydropower. There are 11 generating facilities below Lanier on the ACF, and nine generating facilities below Carters and Allatoona. The Corps' refusal to release water for hydropower production at the

---

of 1070'. The top of the conservation pool was raised by one foot to 1071', ostensibly to support navigation downstream. However, the extra storage created by that change has not been consistently used for that purpose.

upstream reservoirs adversely impacts the amount of hydropower that can be generated from the lower reservoirs.

The consequence is that much more expensive power must be purchased on the open market to offset the loss of production from the federal and non-federal reservoirs in the ACT and ACF Basin. All affected electric rate payers ultimately pay more for electricity so that recreational opportunities and water supply on Lanier and Allatoona can be maximized. Without additional Congressional authorization, the Corps has no authority to impose the burden and expense of maintaining recreational opportunities on all affected electric rate payers in the region, including citizens of Alabama. Alabama alleges that each time the Corps has failed to release available storage for hydropower production to the extent that more expensive power must be purchased on the open market constitutes a final agency action subject to review under the APA. Alabama alleges that the Corps' failure to seek or obtain the necessary Congressional authorization is a discrete, mandatory, and non-discretionary agency action unlawfully withheld and subject to review under the APA.

f) The Corps has adopted a management system and "action zones" that curtail or severely limit releases to support downstream needs, such as navigation, when levels in West Point or Eufaula are low, despite large amounts of water available in Lake Lanier. For example, all releases not necessary to support water supply and water quality are curtailed when a reservoir enters "zone four." In Lake Lanier, zone four begins at 1055' – with twenty feet of conservation storage remaining in the reservoir. By contrast, West Point does not enter zone four until elevation 821', with only one foot of water remaining in the conservation pool. Eufaula fares even worse: the zone four restrictions on releases are not triggered until elevation 184.5', with only six inches of water remaining in the conservation pool. This unjustified

disparity in operations ensures that downstream reservoirs are stressed to their maximum levels during dry weather while water is held upstream for recreation and water supply purposes. Alabama and its citizens have economic, environmental, ecological, recreational, riparian and property interests that are harmed as a result of the Corps' actions. The Corps' development, adoption, and implementation of "action zones" at the federal reservoirs in the ACF and ACT Basins, without conducting the required environmental analysis, marks the culmination of its decision-making process and has immediate legal consequences. Therefore, it constitutes final agency action subject to judicial review under the APA and major federal action subject to the requirements of NEPA.

g) The Corps has adopted and implemented "recreation impact levels" that formalize the Corps' decision to operate Lanier and Allatoona for upstream recreation instead of other authorized uses and downstream interests. For both Allatoona and Lanier, the Corps has adopted "recreation levels" that are factored into operational decisions. For Allatoona, recreational interests begin to be factored into operations at elevation 837 feet, with approximately 88% of storage in the reservoir remaining.[9] For Lanier, the initial recreational impact level is elevation 1066 feet, with approximately 83% of storage remaining. The result of factoring these recreation impact levels into operations at Allatoona and Lanier is that less water is released to support hydropower and navigation. The Corps does not have the authority to modify its operations to support recreation to the extent Congressionally authorized purposes are

---

[9] The conservation pool at Allatoona encompasses all water between elevations 800 feet and 840 feet. Remarkably, however, the Corps has identified elevation 820' as the "Probable Minimum Politically Feasible Pool" at Allatoona. The Corps defines the "Probable Minimum Politically Feasible Pool" as the "level below which no degree of prior studies, plans, or documentation of need will prevail against overwhelming political pressure to prevent pool from being drawn." Of course, the need to avoid "political pressure" is not a valid excuse or justification for failing to operate Allatoona to meet its Congressionally authorized purposes.

significantly affected without Congressional approval. The adoption and implementation of these "recreation impact levels" and the operational changes they have triggered are final agency actions because they mark the culmination of the Corps' decision-making process and have immediate legal consequences. Alabama alleges that the Corps' failure to seek and obtain the necessary Congressional approval prior to elevating recreation over Congressionally authorized project purposes constitutes a discrete, mandatory, and non-discretionary agency action unlawfully withheld and therefore subject to review under the APA.

Even if the adoption and implementation of "recreation impact levels" does not exceed the Corps' authority, Alabama alleges that the specific "recreation impact levels" adopted by the Corps are arbitrary and capricious. Furthermore, despite the clear intent of Congress that the ACF reservoirs be operated as a system, the Corps has expressly adopted recreation impact levels which give undue preference to Lake Lanier at the expense of projects in the lower basin. For example, the initial recreation impact level at Lake Eufaula is set at elevation 187 – with only 47% of storage remaining in the reservoir. More tellingly, the "water access level" (where the most severe impacts to recreation are felt) is set at an elevation that represents 64% of Lake Lanier and at 0% of the storage in Eufaula (*i.e.*, the absolute bottom of the conservation pool). Even assuming the Corps has some authority to set recreation levels on the federally owned reservoirs in the ACT and ACF Basins, its decision to expressly protect and favor upstream recreation while sacrificing downstream recreation, as evidenced by its adoption and implementation of disparate recreation impact levels for the federal reservoirs in the ACT and ACF Basins, is arbitrary and capricious and an abuse of agency discretion. Alabama alleges that the Corps' adoption and implementation of recreation impact levels for the federal reservoirs in the ACT and ACF Basins, without the required environmental analysis, marks the culmination of

55

the Corps' decision-making process, has immediate legal consequences, and is final agency
action subject to review under the APA.

h)      The Corps has adopted a management system and operating guidelines
that expressly give undue preference to recreation at Lanier over recreation at Eufaula, West
Point and all other downstream areas by releasing water necessary to maintain downstream flow
solely from those lower reservoirs, and providing releases from Lanier only as necessary to
prevent the lower reservoirs from being drawn below minimum structural design limits.  Because
the Corps has entered into agreements and implemented operating policies that result in retention
of water in Lake Lanier for recreation and water supply, the lower reservoirs (specifically
Eufaula and West Point) must provide a disproportionate share of the flow needed to support
downstream navigation.  In effect, storage in West Point and Eufaula is used to support federally
required flows for navigation and fish and wildlife while the Corps operates Lake Lanier to
maximize recreation  at Lanier.  Each time the Corps takes such an action is a discrete event
marking the culmination of the Corps' decision-making process and with immediate legal
consequences for downstream users, including the State of Alabama, and is therefore final
agency action subject to review under the APA.

A similar effect occurs in the ACT Basin.  Alabama Power Company is required by
federal law to maintain a flow of 4640 cubic feet per second ("cfs") below its projects in the
ACT Basin to maintain a navigable channel in the Alabama River.  Based on the area that drains
into the system above Carters and Allatoona, the "fair share" of water to support the 4640 cfs
requirement is 1440 cfs at the Mayo's Bar gauge, which is downstream from both of those
reservoirs. Because the Corps has made a final decision not to operate those reservoirs to provide
any support to navigation, even though it is a Congressionally authorized purpose, less than 1440

cfs is released during dry periods. Alabama Power Company is then forced to increase releases from reservoirs in the ACT system, thereby reducing valuable storage and recreational opportunities in, and modifying the hydropower operations of, several popular reservoirs in that basin, including Lake Harris, Lake Martin, Lake Logan Martin, Lake Weiss, Lake Neely Henry, Lay Lake, Lake Mitchell, and Lake Jordan. Thus, the Corps' operations to protect and maximize recreation at Allatoona and Carters have direct, negative impacts on recreation and economic interests in Alabama. Each time the Corps takes such an action is a discrete event marking the culmination of the Corps' decision-making process and with immediate legal consequences for downstream users, including the State of Alabama, and is therefore final agency action subject to review under the APA.

Alabama alleges that the Corps is aware of these dynamics in both the ACT and ACF Basins, and has made a conscious decision (or series of decisions) to operate the federal reservoirs at issue in a manner that elevates recreation over all other project purposes and recreational opportunities at downstream reservoirs. Alabama alleges that each such action and decision in this regard marks the culmination of the Corps' decision-making process and that immediate legal consequences flow from each such action or failure to act. Therefore, the Corps has taken final agency action subject to review under the APA. Alabama further alleges that the Corps has a discrete, mandatory, and non-discretionary legal obligation to seek and obtain Congressional authorization to operate the federal reservoirs in the ACT and ACF Basins in this manner, and its failure to do so is final agency action unlawfully withheld and subject to review under the APA.

i)      The Corps continues to operate Lanier as an independent project, instead of operating all reservoirs in the ACF Basin as a system as Congress intended. The Corps has

acknowledged numerous times and in numerous contexts that the federal reservoirs in the ACF –

Lanier, West Point, Eufaula, and Woodruff – must be operated as a system to maximize the

benefits of the system as a whole. In fact, the Corps has not operated these reservoirs as a

system. At numerous, well-documented times in the past, Lanier has been held relatively full

while lower reservoirs were drained to exceedingly low levels to compensate for the lack of flow

from Lanier. Furthermore, at numerous, well-documented times in the past, lower reservoirs

have been over-filled or pre-maturely filled so that those reservoirs could provide storage to

support downstream navigation and fish and wildlife while Lanier was held at close to full pool

to support recreation and water supply. Alabama alleges that each such instance constitutes final

agency action reviewable under the APA, as the Corps' actual operations necessarily constitute

the culmination of its decision-making process and result in immediate legal consequences to

downstream users, including the State of Alabama. Alabama alleges that the Corps' operation of

Lake Lanier as an independent project is arbitrary, capricious, and otherwise not in accordance

with law.

        j)      The Corps has allowed water supply intake structures to be installed above

the bottom of conservation storage in Lake Lanier and Lake Allatoona, effectively reducing the

range of storage available to support authorized project purposes. For example, the Corps has

allowed the City of Cumming, Georgia, to install water supply intake structures at elevation

1052' in Lake Lanier. In Lake Allatoona, the Corps has allowed the City of Cartersville to

install its water supply intake structure at elevation 820'. The Corps takes the depths of water

supply intake structures into account in the operation of Allatoona and Lanier, and operates to

ensure that water levels in those reservoirs do not drop below the level of the intakes. Because

the storage below the level of the intake structures is no longer used to support Congressionally

authorized purposes, the Corps has, in effect, reallocated all storage below the level of the water supply intake structures to water supply. This modification to Lake Lanier and Lake Allatoona results in major operational change that significantly affects the amount of storage available to support the Congressionally authorized purposes of that reservoir. The Corps has no authority to perform such a *de facto* reallocation without Congressional approval. Alabama alleges that the Corps' decisions to permit installation of intake structures above the bottom of conservation in Lake Lanier and Lake Allatoona are both final agency action and arbitrary, capricious, and otherwise not in accordance with law. Alabama further alleges that the Corps has a discrete, mandatory, and non-discretionary legal obligation to seek and obtain Congressional approval before re-allocating storage in this manner, and that its failure to do so constitutes agency action unlawfully withheld and reviewable under the APA.

88. Each of the general and specific actions and failures to act complained of above has been finalized and confirmed by the Corps' conduct, communications, and internal documents. These actions and failures to act constitute the culmination of the Corps' decision-making process, have immediate impacts on the rights and interests of the State of Alabama and its citizens, and are final and discrete agency actions subject to review under the Administrative Procedure Act. Furthermore, each of the actions complained of above is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with applicable law or regulation.

89. In addition to the specific actions described above, viewing the Corps' operation and management of the federal projects in the ACT and ACF Basins as a whole, it is clear that the Corps has made a conscious decision (or a series of conscious decisions) to support upstream water supply and recreation at the expense of authorized uses. That management policy, as

consistently implemented in actual operations in the ACT and ACF Basins, represents the culmination of the Corps' decision-making process and has immediate legal consequences to downstream users, including the State of Alabama. Alabama alleges that the Corps' management policy in the ACT and ACF Basins violates the Corps' authority, is arbitrary and capricious, and was not made pursuant to the procedures required by the Administrative Procedure Act. To the extent that the Corps has avoided taking any action or making decisions that it is bound by law to make, its failure to act constitutes, in effect, an affirmative act subject to judicial review. Alabama and its citizens have been, and continue to be, aggrieved and adversely affected by these actions, decisions, and failures to act within the meaning of applicable federal law. The Corps' actions and failures to act have inflicted and will continue to inflict concrete injuries on Alabama and its citizens, and are therefore ripe for judicial review. The Corps' actions and failures to act complained of herein constitute final agency actions that are arbitrary, capricious, ultra vires, or otherwise not in accordance with law. To the extent that the Corps is entitled to any discretion regarding the acts and omissions complained of herein, the Corps has abused that discretion. The Corps' actions should therefore be enjoined, disallowed, or set aside as appropriate, and where it has failed to act as required by law it should be compelled to do so.

90.     Additional background facts are alleged in paragraphs 8 through 21 of Alabama's Original Complaint, which Alabama hereby adopts by reference as if fully set forth herein. In addition, Alabama hereby adopts by reference as if fully set forth herein the factual allegations set forth in paragraphs 102 through 114 of Florida's Third Amended and Supplemented Complaint. Alabama and its citizens have been and will continue to be harmed by the Corps' unlawful, unauthorized, arbitrary and capricious, and *ultra vires* operation and management of

the federally owned reservoirs in the ACT and ACF Basins.

### The Settlement Agreement in the D.C. Litigation

91.     On January 9, 2003, the Corps consented to water supply withdrawals and
releases from Lake Lanier as part of an agreement to settle claims against it in *Southeastern
Federal Power Customers, Inc. v. Caldera*, Case No. 1:00CV02975 (D.D.C.) (the "D.C.
litigation"). The settlement agreement is a contract that commits the Corps to reallocate water
storage in Lake Lanier and allow withdrawal of water by certain entities within the State of
Georgia. The Settlement Agreement reallocates 240,858 acre feet of storage in Lake Lanier to
municipal and industrial purposes, which would be approximately 23% of the conservation
storage in that reservoir. The settlement agreement projects the safe yield of this storage for
municipal and industrial purposes of 170.4 million gallons per day from Lake Lanier and 367
million gallons per day from the Chattahoochee River downstream of Buford Dam during the
"Critical Period," which is defined as "the most severe drought of record." If the safe yield of
this storage proves to be less than predicted, however, the Corps agrees that the contracting
parties will be reallocated such additional storage in Lake Lanier as is required to meet the
projected safe yield. The Corps agrees that all return flows to Lake Lanier from the contracting
parties will be deemed to occupy only the storage space reallocated for municipal and industrial
water supply purposes to the extent that storage space is available, and such return flows would
thereafter be available for use only for municipal and industrial water supply purposes. The
Corps agrees to monitor river conditions and make special releases for water supply purposes
when forecasted demands require it. The amount of storage reallocated by the Settlement
Agreement, and the amounts of water it entitles the contracting parties to withdraw, substantially
exceed the current needs of those parties. The contracts included within the Settlement

Agreement provide that they may remain in effect for 20 years, and that they may be converted to permanent contracts. The Corps already executed one of the contracts, which is attached as Exhibit D to the settlement agreement and styled the "Supplemental Agreement to Relocation Contract between the United States of America and the City of Gainesville for Withdrawal of Water from Lake Sidney Lanier, Georgia." The settlement agreement purports to exempt this contract from evaluation under NEPA. The Corps negotiated and consented to the settlement agreement without Alabama's knowledge or approval, and without affording the public an opportunity to comment on its terms.

92. The Corps did not declare the existence of surplus water in connection with the negotiation or approval of the settlement agreement in the D.C. litigation, or in connection with their approval of past and ongoing reallocation of storage in Lake Lanier for municipal and industrial water supply purposes. Nor did the Corps obtain Congressional approval for the re-allocation of storage and modifications to the operations of Lake Lanier required by the Settlement Agreement and associated contracts, despite significant effects to the Congressionally authorized purposes of that reservoir.

93. Even though the Corps has not commenced the NEPA process or initiated the scoping portion of that process, the Corps has indicated that the settlement agreement is the agency's "preferred" alternative.

**Hickory Log Creek Reservoir**

94. On May 14, 2004, the Corps issued a permit to the Cobb County-Marietta Water Authority under Section 404 of the Clean Water Act authorizing construction of a water supply reservoir in the ACT Basin upstream of Lake Allatoona. The permit is for a pump-storage project with water pumped from the Etowah River to Hickory Log Creek Reservoir and then

released for withdrawal to the City of Canton and Cobb County-Marietta Water Authority. The reservoir will provide approximately 40 to 45 MGD of storage for water supply in the ACT Basin.

95.     The original permit application for the Hickory Log Creek Reservoir was submitted to the Corps in May, 2000, and deemed complete on December 27, 2000. Alabama's ACT Commissioner was notified of that application. However, because Alabama, Georgia, and the Corps were at that time negotiating various flow scenarios under the ACT Compact that would have covered any impacts from the proposed reservoir, Alabama did not submit any comments on the permit application to the Corps at that time.

96.     On September 4, 2003, the permit application for the Hickory Log Creek Reservoir was significantly revised. Alabama was not informed of this revision, and on information and belief, Alabama alleges that the revised application was not re-noticed for public comment. Alabama alleges that the revised permit substantially and significantly modified the nature of the project.

97.     On information and belief, Alabama alleges that the Corps issued a Finding of No Significant Impact (FONSI) regarding the construction and operation of the Hickory Log Creek Reservoir. However, the actual permit issued contains numerous "special conditions," including special condition number fifteen, which states:

> Prior to impounding Hickory Log Creek, pumping from the
> Etowah River, or releasing water into the Etowah, the applicant
> shall coordinate with USACE Mobile District on the necessity for
> water supply storage reallocation for Lake Allatoona.

98.     While the precise meaning of special condition 15 is unclear, there would be no need to "coordinate" regarding the "necessity for water supply storage reallocation for Lake Allatoona" unless the construction and operation of Hickory Log Creek Reservoir will

significantly alter the operation and management of Lake Allatoona in a manner that significantly impacts the Congressionally authorized purposes of that project.

99.    Nor is the proposed impoundment on Hickory Log Creek an isolated or insignificant event. The Corps has acknowledged that competition for water resources in northern Georgia has created a "race for permits" needed to impound surface water. Alabama believes there are at least forty-two (42) Section 404 permits for water supply reservoirs in Georgia that are currently permitted, under consideration, or in the pre-application process, including several in the ACT Basin.[10] Specifically, Alabama is informed and believes that the Corps has recently renewed its consideration of the West Georgia Regional Reservoir in the Tallapoosa River system. Alabama alleges that the Corps has never considered the cumulative impacts (both direct and indirect) of these reservoirs as required by Section 404 and NEPA. Specifically, Alabama alleges that the Corps has failed to consider the cumulative impacts of

---

[10] On information and belief, the Corps issued permits under Section 404 of the Clean Water Act in the late 1980s and into the 1990s to various entities for public water supply purposes in the ACT and ACF Basins, including, but not limited to, the following applicants: Dalton Utilities, Application Number 074 0YN 006911 (Jan. 30, 1989) (construction of impoundment for public water supply); Fugi Development USA, Ltd., Application Number 074 0YN 007185 (discharge fill material, diverting flow of stream and other activity for construction of pumping station); Habersham County Water and Sewer Authority, Application Number 074 0YN 007288 (May 8, 1990) (discharge of dredged or fill material for construction of dam and water supply); Dalton Utilities, Application Number 074 0YN 0060234 (Jan. 14, 1992) (discharge of fill material for construction of dam and water supply reservoir); Lumpkin County Water & Sewer Authority, Application Number 00-60251-KD (Nov. 29, 1990) (discharge of dredged and fill material for water supply reservoir); Carroll County Water Authority, Application Number 91-00469 (May 8, 1991) (discharge of dredged and fill material for the construction of a dam and water supply reservoir); Fayette County Board of Commissioners, Application Number 074-0YN-0060246 (Dec. 26, 1991) (discharge of dredged and fill material for the construction of a dam and water supply reservoir); Mr. Ronald L. Harris, Engineering Strategies, Inc., Application Number 980001900 (Aug. 26, 1998) (construct water supply reservoir, water treatment plant, and water transmission pipeline). Alabama alleges that the Corps has never conducted a full and adequate analysis of the environmental impacts of these activities, specifically including the indirect and cumulative impacts of these permits, as required by NEPA.

construction of the Hickory Log Creek Reservoir on the ACT Basin as a whole, taking all other permitted or proposed water supply reservoirs and withdrawals from existing reservoirs into account, as required by CWA Section 404 and NEPA. Alabama alleges that the Corps' FONSI and decision to issue a permit for the Hickory Log Creek Reservoir is final agency action reviewable under the APA.

### The Corps' Failure to Comply With NEPA

100. Each of the actions and decisions referenced above is a final, major federal action significantly affecting the quality of the human environment. Moreover, each of the actions and decisions described above is a change to Corps' projects that either adds additional project purposes (specifically, water supply and recreation) or requires major changes in the operation and/or management of Corps projects. However, the Corps has implemented these decisions and taken these actions without any NEPA analysis or consideration of alternatives.

### The Corps' Failure to Comply with the ESA

101. On October 4, 2004, Alabama sent the Corps and the United States Fish & Wildlife Service a letter putting them on notice of the ESA violations set forth herein pursuant to 16 U.S.C. §1540(g). In particular, Alabama gave notice that the Corps' discretionary actions and failures to act in the operation and management of federal reservoirs in the ACT and ACF Basins had the potential to jeopardize the continued existence of numerous federally listed species, including but not limited to the Goldline Darter, Blue Shiner, Alabama Sturgeon, Etowah Darter, Cherokee Darter, Amber Darter, Conasauga Logperch, Alabama Moccaninshell Mussel, Orange-nacre Mucket, Fine-lined Pocketbook Mussel, Upland Combshell Mussel, Southern Acornshell Mussel, Triangular Kidneyshell Mussel, Southern Pigtoe Mussel, Southern Clubshell Mussels, Ovate Clubshell Mussel, Coosa Moccasinshell Mussel, Shiney-rayed Pocketbook Mussel, Fat

Threeridge Mussel, Gulf Moccasinshell Mussel, Oval Pigtoe Mussel, Cylindrical Lioplax Snail,

Flat Pebblesnail, Lacy Elimia Snail, and the Painted Rocksnail.

102. Specifically, Alabama gave notice that:

> The U.S. Army Corps of Engineers' operational schemes,
> operational decisions, water resource allocation decisions,
> permitting decisions, and other actions (or failures to act) adversely
> impact, jeopardize, or imperil the threatened or endangered species
> listed above in violation of the Endangered Species Act, 16 U.S.C.
> § 1531, et seq. Specifically, the following acts or omissions of the
> U.S. Army Corps of Engineers violate the Endangered Species
> Act:

> 1. Operating federal projects in a manner intended to maintain
> high reservoir levels in upstream reservoirs to support recreation in
> the absence of legal authority to do so and in violation of approved
> and adopted water control plans without adequate assessment of
> the impact to species habitat.

> 2. Operating federal projects in a manner requiring
> modification of hydropower production schedules in violation of
> approved and adopted water control plans, thus impacting flow
> regimes without adequate assessment of impacts to species habitat.

> 3. Operating federal projects in a manner that unlawfully
> reduces, alters, or delays downstream releases for hydropower and
> navigation and thereby adversely impacts, jeopardizes, and
> imperils the habitat and ecological viability of endangered and
> threatened species.

> 4. Failing to adequately assess the impacts of its unlawful
> operation of federal projects for recreation and water supply
> purposes on endangered and threatened species and the habitat on
> which those species depend.

> 5. Entering water supply contracts to various water
> withdrawal and water supply entities within the State of Georgia
> known to be in violation of the Clean Water Act and various orders
> of the United States District Court, and contributing to aquatic
> habitat degradation and destruction.

> 6. Committing to provide water supply to various water
> withdrawal and supply entities within the State of Georgia where
> known wastewater discharges directly resulting from such
> contracts contribute to the degradation of water quality in certain

impacted tributary streams and rivers, and contributing to aquatic habitat degradation and destruction.

7.      Failing to acknowledge and consider various stream impairments as established by the U.S. Environmental Protection Agency and the State of Georgia, and to knowingly and willfully disregard the impacts of operational activities and other actions on such impairments.

8.      Failing to acknowledge and recognize the impact of reduced flows on aquatic habitat.

9.      Failing to fully inform and to disclose to cognizant agencies and legal entities, such as the U.S. Fish and Wildlife Service and the State of Alabama, the full nature of adopted operational schemes and the resulting impacts on stream flows and water quality, and hence habitat.

10.      Failing to adequately assess impacts to endangered and threatened species habitat in the performance of certain environmental assessments and environmental impact statements.

11.      Failing to consider the full environmental impacts of Clean Water Act, Section 404 Permits, on water quality, stream flows, habitat degradation, and endangered species recovery plans.

103.      Alabama bases these allegations on a multitude of data and information relating to the environmental and ecological conditions in the ACT and ACF Basins as they relate to endangered or threatened species in the basins and the habitat necessary for those species continued survival and recovery.  The relationship between flow regimes and the biological needs of these species is well documented and specifically referenced by the United States Fish & Wildlife Service in its July, 2004 designation of critical habitat in the ACT Basin.

**The Corps' Failure to Consult With Alabama Pursuant to Applicable Law And Regulation**

104.      Aside from its obligations under NEPA and the ESA, the Corps has a non-discretionary legal duty to consult with states affected by changes in its operation and management of federal reservoirs under various laws and regulations, as set forth above.  The

Corps has failed to consult consistently with Alabama regarding the actions and failures to act outlined above. At best, the Corps' communications with Alabama regarding its plans, procedures, operations and intentions in the ACT and ACF Basins have been sporadic and largely after the fact. The Corps' apparent unwillingness to include Alabama in the process by which it makes operational and management decisions contrasts sharply with its cooperative arrangement with entities in Georgia, who have input into the Corps' operations on a weekly basis. The Corps' has a discrete, mandatory, and non-discretionary duty to consult with Alabama in accordance with applicable laws and regulations, as described above, and its failures to do so in connection with the actions and failures to act described in the foregoing paragraphs constitute final agency actions unlawfully withheld and subject to review under the APA.

### History of Alabama's Opposition to the Corps' Wrongful Operations

105.    Alabama has been actively challenging the Corps' authority to operate the federally owned reservoirs in the ACF and ACT Basins in the unlawful manner described above for over fifteen years. The extensive history of those challenges is set forth in paragraphs 26 through 43 of Alabama's Second Amended Complaint, which are specifically adopted by reference as if fully set forth herein.

106.    As outlined in the portions of Alabama's Second Amended Complaint referenced in the preceding paragraph, Alabama was a signatory to both the ACF and ACT Compacts. On August 31, 2003, the governors of Alabama, Florida, and Georgia failed to reach an agreement to extend the ACF allocation negotiations, and the ACF Compact dissolved pursuant to the terms of that agreement.

107.    Though the ACT Compact remained in force after the dissolution of the ACF Compact, Alabama and Georgia were unable to make substantial headway in the allocation

68

negotiations in the ACT Basin. The ACT allocation negotiations were greatly complicated by Georgia's insistence that performance of any allocation formula under the ACT Compact be linked to implementation of the disputed Settlement Agreement. Unable to resolve these and other important issues, the governors of Alabama and Georgia declined to extend allocation negotiations past July 31, 2004, and the ACT Compact dissolved on that date.

108. The collapse of both Compacts has important ramifications. As part of both the ACT and ACF Compacts, the signatories agreed to a "live and let live" provision that allowed each party to continue, and under certain limited circumstances increase, its withdrawals from the ACT and ACF Basins during the life of the Compact.

109. Specifically, the Compacts stated that:

> The parties to the Compact further agree that any such person may increase the amount of water resources withdrawn, diverted or consumed to satisfy reasonable increases in the demand of such person for water between the effective date of this Compact and the date on which an allocation formula is approved by the ACF Basin Commission as permitted by applicable law. . . .This Article shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used between January 3, 1992 [the date of the MOA] and the date on which the Commission adopts an allocation formula.

ACF Compact, Article VII, Section (c). [11]

110. Therefore, all withdrawals under the "live and let live" provisions of the Compacts were required to comply with all "applicable federal laws," and any increased withdrawals were limited to those reasonably necessary to satisfy increased demand *during the life of the Compacts*. The "live and let live" provisions did not contemplate or allow increased withdrawals or diversions of water to satisfy anticipated future demands, nor did they authorize

---

[11] The quote above is taken from the ACF Compact. The ACT Compact contained a substantively identical provision.

withdrawals that violate federal law and applicable regulation. Furthermore, the Compacts both specifically stated that withdrawals or diversions made under the "live and let live" provisions did not operate to grant any permanent, vested, or perpetual rights to water withdrawn or diverted during the life of the Compacts.

111. During the life of the Compacts, the Corps granted storage rights and/or water supply contracts, "holdover contracts" or agreements to various entities in Georgia for increased withdrawals from federally owned and operated reservoirs in the ACT and ACF Basins, purportedly under the "live and let live" provisions. Furthermore, the Corps also allowed entities to increase withdrawals under existing and "expired" contracts to levels that greatly exceed the original contract amount. As outlined above, the Corps' allocation or use of storage to meet these withdrawals does not comply with all applicable federal laws and regulations, and the Corps' actions in allowing those withdrawals constitute licenses, privileges, or relief, or the equivalent thereof, and are final agency actions otherwise not in accordance with federal law as outlined below and are due to be set aside under the authority of the Administrative Procedure Act.

112. Both the ACT and ACF Compacts have now expired. There is no longer any authority for the withdrawals that the Corps has allowed under the "live and let live" provisions. As the Compacts expressly stated that the "live and let live" provisions did not grant any permanent, vested, or perpetual rights to water withdrawn during the life of the Compacts, there is no longer any justification or authority for those withdrawals, which have not been effectuated in accordance with federal law and applicable regulations in any event.

**The Settlement Agreement**

113. As this Court is well aware, the Corps executed a purported settlement of

litigation in the United States District Court for the District of Columbia in violation of an order

of this Court. After a full evidentiary hearing, this Court issued a preliminary injunction against

filing or implementation of the Settlement Agreement, as well as a preliminary injunction against

execution of any additional water storage or withdrawal contracts in the ACF Basin. That

injunction was appealed, and subjected to a limited remand for this Court to consider what

impact, if any, the United States District Court for the District of Columbia's putative approval

of the Settlement Agreement has on the injunction. The Court denied motions to dissolve the

injunction on that basis, and that denial became the subject of a separate appeal. Both appeals

have been fully briefed and argued, and as of the time of the filing of this amended complaint

both appeals remain pending before the Eleventh Circuit Court of Appeals.

### September 5, 2006 Biological Opinion Issued by FWS

114.     On January 31, 2006, in connection with its claims in this lawsuit, plaintiff-

intervenor State of Florida filed before this Court a Motion For Preliminary Injunction on

Endangered Species Act Claims. See Doc. 382. As part of that Motion, Florida sought an order

"[d]irecting the Corps to consult formally with the U.S. Fish and Wildlife Service ("FWS"),

pursuant to ESA Section 7(a)(2) . . . . regarding the impact of the Corps' discretionary ACF dam

and reservoir operations . . . ." In response to Florida's Motion, the Corps formally requested

that the FWS initiate consultation under the ESA on March 7, 2006. The Corps and FWS began

formal consultation under the ESA shortly thereafter, and on September 5, 2006, the FWS issued

a Biological Opinion on the impact of the Corps' operation of federal reservoirs in the ACF

Basin on four federally protected species: the gulf sturgeon and three species of freshwater

mussels (purple bankclimber, fat three-ridge, and Chipola slabshell). The Biological Opinion

issued by FWS has important legal and practical implications for the Corps' operation of the

federal reservoirs in the ACF Basin, including Lake Eufaula and West Point Lake, in which the

State of Alabama has important sovereign interests. Alabama alleges that its important interests

in the ACF Basin are and will be significantly harmed unless the Biological Opinion is set aside

pursuant to the judicial review provisions of the APA. Specifically, the BiOp at issue analyzes

the impact of the Corps' so-called "Interim Operating Procedure" or "IOP," which the Corps has

developed to govern operation of the federal reservoirs in the ACF Basin. The IOP was

originally set forth in conjunction with the Corps' request for formal consultation in response to

Florida's Motion requesting initiation of formal consultation under the ESA. By letter dated

June 12, 2006, the Corps submitted to FWS a revised version of the IOP and shortly thereafter

FWS requested an extension of the formal ESA consultation to analyze the revised IOP. On

September 5, 2006, FWS released its BiOp assessing the Corps' proposed operations under the

"revised" IOP. Alabama alleges that preparation and issuance of the Biological Opinion

constitutes final agency action reviewable under the APA.

## FIRST CAUSE OF ACTION

### THE CORPS HAS VIOLATED ITS DUTY TO OPERATE THE FEDERALLY OWNED RESERVOIRS IN THE ACF AND ACT AS A SYSTEM TO SUPPORT THE PROJECT PURPOSES FOR WHICH THEY WERE AUTHORIZED

115. Alabama re-alleges and incorporates by reference paragraphs 1 through 114 of

this Fifth Amended and Supplemented Complaint as if fully set forth herein.

116. The federally owned reservoirs in the ACT and ACF Basins were authorized,

funded, and constructed for the benefit of all citizens of the United States and for certain specific

project purposes specifically identified and authorized by Congress. The Corps has a mandatory,

non-discretionary legal duty to operate and manage federally owned reservoirs according to

those authorized purposes, and does not have the legal authority or discretion to abandon, re-

order, or significantly impair those authorized purposes.

117. The operation of each reservoir in the ACT and ACF Basins affects upstream and downstream reservoirs. Therefore, Congress recognized that the federal reservoirs in the ACF and ACT must be operated by the Corps as an integrated system in order to fulfill the individual purposes of flood control, navigation and hydropower generation at other projects, private and public. The Corps has repeatedly recognized this principle in regulations, guidance documents, and other publications.

118. Changes in reservoir operations or allocations in an upstream reservoir will place burdens on the ability of downstream reservoirs to fulfill their authorized or licensed purposes. Reallocating storage capacity and allowing water supply withdrawals in Lake Lanier, Lake Allatoona and Carters Lake, for example, reduces flows available for hydropower in downstream reservoirs and disrupts storage uses for flood control and navigation. Taken together, the federal laws and regulations governing and authorizing the Corps to construct, operate, and maintain federal reservoirs in the ACT and ACF Basins make clear that the Corps has a mandatory and non-discretionary legal duty to manage those projects as a system to meet their Congressionally authorized purposes and to maximize the benefits of all federal projects in each Basin for all citizens in the ACT and ACF Basins.

119. The failure to manage the federal projects in the ACT and ACF as a system or to properly account for the impacts to authorized downstream project purposes has resulted in repeated actions or failures to act that have resulted in a consistent pattern of preferential treatment for upstream users in the Atlanta metropolitan area, and encourages wasteful and inefficient use of the Basins' water resources, to the direct and substantial detriment of downstream real property (including but not limited to riparian property), economic interests, other property interests, and aesthetic, environmental, ecological and recreational interests in

Alabama. In addition, the Corps' failure to operate the federally owned reservoirs on the ACF and ACT as an integrated system results in lost production of hydropower, increased costs associated with hydropower production, and ultimately higher electricity costs for many citizens of Alabama.

120.    The Corps' past and current operations of federal reservoirs in the ACF and ACT Basins unfairly and unlawfully favor upstream users at the expense of lawful downstream users. As Alabama alleged in Count 1 of its Original Complaint, the Corps has never adequately addressed the severe and adverse impacts that its preferential operations of upstream reservoirs have on downstream uses, and has generally breached its duty to operate Lake Lanier, Carters Lake, and Lake Allatoona according to their project purposes and in a neutral and objective manner for the benefit of all users. Nor has the Corps adequately consulted with Alabama regarding the impacts of its operation of upstream reservoirs in the ACT and ACF Basins. The Corps breaches these duties when it operates a reservoir in a manner that significantly impacts authorized project purposes without the necessary Congressional approval or adequate consultation and input from other impacted users. Specifically, Alabama alleges that the Corps has breached its duties to operate the federally owned reservoirs in the ACT and ACF as a system to support the interrelated project purposes for which they were authorized through the following final agency actions and failures to act:

A.    Entering water supply contracts with various entities in the State of Georgia for the withdrawal of water from storage in the federal reservoirs in the ACT and ACF Basins as more specifically alleged in paragraphs 70-77.

B.    Allowing water supply withdrawals from the federal reservoirs in the ACT and ACF Basins in excess of the amounts specified in the contracts referenced in paragraphs 70-77.

C.    Allowing, pursuant to specific agreements with water supply entities or otherwise, water supply withdrawals from the federal reservoirs in the ACT and ACF Basin in the absence of valid storage contracts, or continuing to allow water supply withdrawals on a "holdover contract" basis after such contracts had expired, as described in paragraphs 70-77.

D.      Establishing and implementing the "Upper Chattahoochee River Management Plan" or "river management system" as described in paragraphs 70-78 and 87(c ) and (h).

E.      Developing and implementing management guidelines and operational parameters that effectively re-allocate massive amounts of storage in the federal reservoirs in the ACT and ACF Basins from Congressionally authorized purposes such as hydropower and navigation to other uses, such as water supply and recreation, as more fully described in paragraphs 78-90.

F.      Consistently and repeatedly holding water in upstream reservoirs while that water was needed to support downstream uses specifically authorized by Congress, as more fully described in paragraphs 82-86 and 87(a),(c),(d),(e) and (i).

G.      By determining that Lake Allatoona will not be operated to support navigation in the ACT Basin even though navigation is a Congressionally authorized project purpose, as more fully described in paragraphs 82, 87(a), (b) and 88-90.

H.      Establishing, adopting, and implementing "action zones" to govern the operation of the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 87(a), (d), (f) and 88-90.

I.      Establishing, adopting and implementing "recreation impact levels" at Lake Lanier and Lake Allatoona that result in impairment of Congressionally authorized project purposes downstream and arbitrarily and unfairly favor recreation at those reservoirs while sacrificing recreational opportunities at downstream reservoirs, as described in paragraphs 82-87(g) and 88-90.

J.      Allowing water supply intake structures to be installed in Lake Lanier and Lake Allatoona well above the bottom the conservation pools in those reservoirs, thereby effectively re-allocating massive amounts of storage to water supply without Congressional authorization, as described in paragraphs 82-86, 87(j) and 88-90.

K.      Failing to seek and obtain the required Congressional approval before entering into agreements, contracts (whether permanent, temporary, interim, holdover, or otherwise) for the use of storage space in the federal reservoirs in the ACT and ACF Basin in amounts that significantly impact the Congressionally authorized purposes of the those federal reservoirs, as more fully described in paragraphs 70-77.

L.      Failing to seek and obtain the required Congressional approval before engaging in operations at the federal reservoirs in the ACT and ACF Basin (including but not limited to setting action zones and recreation impact levels) that significantly impact the Congressionally authorized purposes of the those federal reservoirs, as described in paragraphs 82 – 90.

M.      Executing the Settlement Agreement in the D.C. litigation as more fully described in paragraphs 91-93.

The Corps has therefore exceeded its authority and violated its mandatory legal duty to

operate the federally owned reservoirs in the ACF and ACT Basins in a manner consistent with

their Congressionally authorized purposes. As a result, the Corps has caused severe and detrimental impacts to real property (including but not limited to riparian property), economic interests, other property interests, and aesthetic, environmental, and recreational interests in Alabama.

## SECOND CAUSE OF ACTION

## THE CORPS' ACTIONS VIOLATE THE NATIONAL ENVIRONMENTAL POLICY ACT

121.    Alabama re-alleges and incorporates by reference paragraphs 1 through 120 of this Fifth Amended and Supplemented Complaint as if fully set forth herein.

121.1.  The Corps' operation and management decisions regarding federal reservoirs in the ACF and ACT Basins, as outlined above and specifically identified below, constitute major federal actions significantly affecting the quality of the environment.  Alabama alleges that the following major federal actions are specific actions and discrete failures to act in the face of mandatory and non-discretionary duties to do so are subject to review under this cause of action:

A.    Entering water supply contracts with various entities in the State of Georgia for storage in the federal reservoirs in the ACT and ACF Basins as more specifically alleged in paragraphs 70-77.

B.    Allowing water supply withdrawals from the federal reservoirs in the ACT and ACF Basins in excess of the amounts specified in the contracts referenced in paragraphs 70-77.

C.    Allowing, pursuant to specific agreements with water supply entities, water supply withdrawals from the federal reservoirs in the ACT and ACF Basin in the absence of valid storage contracts, or continuing to allow water supply withdrawals on a "holdover contract" basis after such contracts had expired as alleged in paragraphs 70-77.

D.    Establishing and implementing the "Upper Chattahoochee River Management Plan" or "river management system" as described in paragraphs 70-77, 87(a), (c ), and 88-90.

E.    Developing and implementing management guidelines, policies, and operating rules that effectively re-allocate massive amounts of storage in the federal reservoirs in the ACT and ACF Basins from Congressionally authorized purposes such as hydropower and navigation to other uses, such as water supply and recreation, as more fully described in paragraphs 78-90.

F.    By determining that Lake Allatoona will not be operated to support navigation in the ACT Basin even though navigation is a Congressionally authorized project purpose as described in paragraphs 79, 82, 87(a), (b) and 88-90.

G.    Establishing, adopting, and implementing "action zones" to govern the operation of the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 87(a), (d) and (f).

H.     Establishing, adopting and implementing "recreation impact levels" at Lake Lanier and Lake Allatoona that result in operations which significantly impact Congressionally authorized project purposes downstream, as described in paragraphs 78-86, 87(g) and 88-90.

I.     Permitting water supply intake structures to be installed in Lake Lanier and Lake Allatoona well above the bottom the conservation pools in those reservoirs, thereby effectively re-allocating massive amounts of storage to water supply without Congressional authorization, as described in paragraphs 82-86 and 87(j).

J.     Issuing a permit for the Hickory Log Creek Reservoir without fully complying with the procedural requirements of NEPA, as described in paragraphs 94-99.

K.     Operating the federal reservoirs in the ACT and ACF Basins pursuant to water control plans, water control manuals, and master manuals without fully complying with the procedural requirements of NEPA, as described in paragraphs 78-81.

L.     Executing the Settlement Agreement in the D.C. Litigation as more fully described in paragraphs 91-93 without initiating the scoping and alternatives analysis required by NEPA before choosing its "preferred" alternative.

122.     Prior to taking such actions, the Corps did not prepare an EIS, nor did the Corps make any finding of no significant impact based on an EA. The Corps has failed to make any such environmental review that may have been performed available for public comment as required under NEPA and regulations implementing NEPA as adopted by the Council on Environmental Quality and the Corps. See 33 C.F.R. §230.1-230.36.

123.     Furthermore, the Corps' participation as a signatory to the D.C. Settlement Agreement required approval by the Assistant Secretary of the Army (Civil Works). This approval was obtained without following required NEPA procedures. Under NEPA, agencies "shall integrate the NEPA process with other planning at the earliest time" and "environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents." The provisions under the Settlement Agreement clearly were reviewed, and approved, by senior officials within the Department of the Army, as evidenced by signature blocks in Settlement Agreement. NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves

unresolved conflicts concerning alternative uses of available resources." There has been no
presentation or analysis of alternatives to the Settlement Agreement. Nor has there been any
analysis of the cumulative impacts of the contracts proposed under the Settlement Agreement,
including impacts on inter-basin transfers to and from the ACT and other river basins and the
potential cumulative impacts of the regional reservoirs that Georgia has proposed, including the
Hickory Log Creek and West Georgia Regional Reservoirs. Nevertheless, the Corps has
indicated that implementation of the Settlement Agreement is its "preferred alternative." In
effect, the Corps' actions and management decisions have resulted in operations that are
substantially similar to those proposed in 1989 without any adequate analysis under NEPA.
Alabama's original complaint alleged that the Corps had failed to comply with NEPA with
respect to the reallocation proposals on the table in 1989, and, though the circumstances have
changed somewhat since this lawsuit was initiated, Alabama alleges that the Corps has taken
substantially the same action that it proposed in 1989 without complying with NEPA, despite the
existence of this lawsuit and two interstate compacts.

124. The Corps' decisions, actions, and failures to act regarding operations of Lake
Lanier, Lake Allatoona, and Carters Lake in the manner more fully described above have
impacted the quality of human life and the environment in Alabama in the past, and will continue
to do so in the future.

125. The Corps' actions outlined above involve unresolved conflicts over alternative
uses of available resources, and yet, the Corps has not made any prior evaluation of alternatives
as mandated by Section 102(2)(E) of NEPA. The Corps has failed to conduct any NEPA
analysis of the impacts, both direct and cumulative, of the actions and failures to act specified
above. As a result, Alabama and its citizens have been wrongfully denied any opportunity to

participate in the Corps' management of vital natural resources in which Alabama and its citizens have direct and substantial interests. Alabama and its citizens have direct and substantial interests in the Corps' compliance with the provisions of NEPA and are within the zone of interest protected by the statute.

126. Alabama alleges that the Corps' failures to comply with NEPA have had, and will continue to have, serious and detrimental impacts on real property (including but not limited to riparian property), economic interests, other property interests, and aesthetic, environmental, ecological, and recreational interests in Alabama, in that the full environmental impacts of the Corps' actions specified above have never been subjected to a NEPA analysis. Alabama and its citizens have direct and substantial interests in the Corps' compliance with the provisions of NEPA and are within the zone of interest protected by the statute.

127. Furthermore, the Corps's issuance of a FONSI for the Hickory Log Creek reservoir in the ACT Basin was arbitrary and capricious. Despite the FONSI, the Corps has recognized in the permit that operation of the reservoir may necessitate reallocation of storage in Lake Allatoona. Any reallocation of storage in Allatoona or significant change in the operation of that federal project will have a major impact on the human environment and issues relating to such a reallocation or operational change must be subjected to NEPA scrutiny before the permit can be issued.

128. Nor has the Corps analyzed and considered the cumulative impacts, both direct and indirect, of the Hickory Log Creek reservoir. The Hickory Log Creek permit is but one of many proposed or existing projects in the ACT Basin, and the Corps is required by law to analyze the incremental impact of the project when added to other past, present and reasonably foreseeable future actions in the ACT Basin. The cumulative impacts of water supply activities

in the upper ACT Basin have never been adequately assessed by the Corps, and were not

adequately assessed in connection with the Hickory Log Creek permit. To the extent that the

Corps purported to consider the cumulative impacts of the Hickory Log Creek permit, its

analysis was insufficient to justify issuance of a FONSI for the project.

### THIRD CAUSE OF ACTION

### THE CORPS' ACTIONS VIOLATE THE ENDANGERED SPECIES ACT

129.    Alabama re-alleges and incorporates by reference paragraphs 1 through 128 of

this Fifth Amended and Supplemented Complaint as if fully set forth herein.

130.    As outlined above, the ACF and ACT Basins are home to numerous endangered

and threatened species, including but not limited to the gulf sturgeon and numerous species of

federally-protected mussels. On July 1, 2004, the United States Fish & Wildlife Service

designated large portions of the ACT Basin as critical habitat for numerous species of

endangered and threatened freshwater mussels. In identifying the biological and physical

parameters essential to the conservation of the endangered and threatened mussel species in the

ACT Basin, the Fish & Wildlife Service specifically identified issues of water quality and water

quantity. Alterations to the minimum flow in the designated areas or to the existing flow regime

are specifically recognized as actions that might appreciably impact the long-term survival and

recovery of the threatened and endangered species in both basins. Alabama alleges that the

following specific actions and failures to act by the Corps violate the provisions of the

Endangered Species Act and implementing regulations:

A.    Allowing continuing and increasing withdrawals of water from the federal
reservoirs in the ACT and ACF Basins, through water supply contracts, water withdrawal
contracts, other agreements, or otherwise that result in a significant modification of habitat,
including designated critical habitat, below those federal reservoirs. The specific contracts and
agreements alleged to violate the Endangered Species Act and implementing regulations are set
forth in more detail in paragraphs 70-77.

81

B.  Modifying operations at the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 78-90, in a manner that results in adverse modification of habitat, including designated critical habitat, in downstream areas of those basins inhabited by listed endangered species.

C.  Adopting and implementing management plans and criteria for the federal reservoirs in the ACT and ACF Basins that have on-going and long-term effects on habitat, including designated critical habitat, in downstream areas of those basins inhabited by listed endangered species, as more fully described in paragraphs 78-90.

D.  Determining not to operate Lake Allatoona to support navigation, as described in paragraphs 79, 82, 87(a), (b) and 88-90, which has significant adverse effects on habitat, including designated critical habitat, in the downstream areas of the ACT basin and which leads to injury of endangered species.

E.  Establishing and implementing the "Upper Chattahoochee River Management Plan" or "river management system" as described in paragraphs 70-77, 87(a), (c ), and 88-90.

E.  Developing and implementing management guidelines, policies, and operating rules that effectively re-allocate massive amounts of storage in the federal reservoirs in the ACT and ACF Basins from Congressionally authorized purposes such as hydropower and navigation to other uses, such as water supply and recreation, as more fully described in paragraphs 78-90.

G.  Establishing, adopting, and implementing "action zones" to govern the operation of the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 87(a), (d) and (f).

H.  Establishing, adopting and implementing "recreation impact levels" at Lake Lanier and Lake Allatoona that result in operations which significantly impact Congressionally authorized project purposes downstream, as described in paragraphs 82-87(g) and 88-90.

I.  Permitting water supply intake structures to be installed in Lake Lanier and Lake Allatoona well above the bottom the conservation pools in those reservoirs, thereby effectively re-allocating massive amounts of storage to water supply without Congressional authorization, as described in paragraphs 82-86 and 87(j).

J.  Executing the Settlement Agreement in the D.C. Litigation as more fully described in paragraphs 91-93 without initiating the scoping and alternatives analysis required by NEPA before choosing its "preferred" alternative.

131.  The actions of the Corps in allocating storage space, changing operations to favor recreation, water supply, and/or drought protection over authorized uses, and supplying water for M&I use, as more fully outlined above, are discretionary and final agency actions that jeopardize

and will continue to jeopardize the continued existence of endangered or threatened species, hamper, impede, and prevent recovery efforts for threatened or endangered species, and/or result in the destruction or adverse modification of habitat of such species, and as such constitute the "taking" of a specie(s). The actions of the Corps as outlined above constitute agency action within the meaning of the Endangered Species Act.

132.     The Corps has failed and continues to fail to consult with the Secretary of the Interior as required by Section 7 of the Endangered Species Act and implementing regulations prior to taking the actions specifically identified above.  As trustee of the natural resources within its borders, Alabama is within the zone of interest covered by the Endangered Species Act.

## FOURTH CAUSE OF ACTION

## THE CORPS HAS FAILED TO DEVELOP AND IMPLEMENT VALID RESERVOIR REGULATION MANUALS ,OR, IN THE ALTERNATIVE, THE CORPS HAS FAILED TO OPERATE IN ACCORDANCE WITH ITS OPERATION MANUALS

133.     Alabama re-alleges and incorporates by reference paragraphs 1 through 132 of this Fifth Amended and Supplemented Complaint as if fully set forth herein.

134.     The Corps is required by law to prepare and finalize Water Control Manuals for each federally owned project under the control and supervision of the Corps.  33 C.F.R. § 222.5(i)(2).  Those Water Control Manuals must be prepared giving appropriate consideration to all applicable federal laws, including the National Environmental Policy Act and the Endangered Species Act.  Furthermore, the Corps is required to develop Water Control Plans in concert with "all basin interests which are or could be impacted by . . . project regulation." 33 C.F.R. § 222.5(f)(9).   Close coordination will be maintained with all appropriate international, Federal, State, regional, and local agencies in the development and execution of water control plans.   Id. Where two or more federal projects are operated in the same basin, the Corps is required to

develop and implement a Master Manual to govern operations on all such reservoirs.

135.    On information and belief, Alabama alleges that appropriate documents for the federally-owned reservoirs in the ACT and ACF Basin have never been finalized and subjected to the appropriate review and coordination under federal law and the Corps' own regulations. As a result, Alabama and its citizens have been denied any opportunity to participate in the Corps' development of management criteria and operating guidelines having wide-ranging impacts on vital natural resources in which Alabama and its citizens have direct and substantial interests.

136.    To the extent the Corps purports to have developed final Water Control Plans, Reservoir Regulation Manuals, or Master Manuals for federal projects in the ACF and ACT Basins, Alabama alleges that the Corps has either 1) failed to comply with the procedures for developing and finalizing such plans mandated by federal law and regulations, or 2) failed to update and modernize those documents as required by federal law and regulation. Furthermore, to the extent the Corps purports to have developed final Water Control Plans, Reservoir Regulation Manuals, or Master Manuals for federal projects in the ACF and ACT Basins, Alabama alleges that the Corps has taken final actions, as outlined in paragraphs 78-81, not in accordance with the mandatory legal duties imposed in those documents, and has failed to take discrete actions, as outlined in paragraphs 74-81, as required by those documents.

137.    The Corps has a discrete, non-discretionary legal duty to prepare, finalize, and implement appropriate manuals and plans for the federally owned reservoirs in the ACT and ACF Basins, and its failure to do so constitutes final agency action unlawfully withheld under the meaning of the APA.

## FIFTH CAUSE OF ACTION

## THE CORPS' ACTIONS AND DECISIONS RELATING TO WATER SUPPLY AND RECREATION VIOLATE THE FLOOD CONTROL ACT

138.   Alabama re-alleges and incorporates by reference paragraphs 1 through 137 of this Fifth Amended and Supplemented Complaint as if fully set forth herein.

139.   The Flood Control Act prohibits the Corps from entering into contracts for domestic and industrial uses for "surplus water" under its control that will adversely affect existing uses of such water.  The Flood Control Act states:

> The Secretary of the Army is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on which terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the Department of the Army; *Provided*, That no contracts for such water shall adversely affect then existing lawful uses of such water...

33 U.S.C. § 708.

140.   On information and belief, Alabama alleges that the Corps has never made a surplus water declaration for Lake Lanier, Lake Allatoona, or Carters Lake.  In fact, the Corps' own documents, public statements, and management policies all recognize that the federally owned reservoirs in the ACF and ACT Basins have not in the past and do not currently support all Congressionally authorized project purposes.  For example, the Corps has admitted that there is not enough water in the ACF Basin to meet the Congressionally authorized nine foot navigation channel with anything approaching consistency.  Furthermore, the demand for power greatly exceeds the amount of power that has been made available from the federally owned reservoirs in the ACT and ACF Basins, to the extent that more expensive power has been purchased from outside the system to meet contract demands.  There is no "surplus water" available in federally owned reservoirs in the ACT and ACF Basin within the meaning of the

Flood Control Act. In fact, Congress determined that there was no surplus water in Lake Lanier

as early as 1956. See Pub. L. No. 84-841, 70 Stat. 725 (1956); H.R. Rep. No. 84-2672, at 2

(1956).

141.    Despite not having prepared any "surplus water" analyses for Lake Lanier,

Carters Lake, or Lake Allatoona as required by the Flood Control Act, the Corps has entered into

numerous, discrete water supply contracts and/or contracts for the allocation of storage for water

from those reservoirs for water supply purposes, and has continued to perform under those

contracts beyond their lawful terms and without legal authority. To the extent the Corps has

based its execution and continuing performance of those contracts on the provisions of the Flood

Control Act, the Corps' actions are unlawful and should be set aside. Furthermore, the Corps has,

at various times, indicated that its authority to enter the water supply contracts contemplated by

the Settlement Agreement is at least partially based on the Flood Control Act. Therefore, the

Settlement Agreement must comply with the provisions of the Flood Control Act. Alabama

specifically alleges that the following discrete, final agency actions and failures to act in the face

of mandatory, non-discretionary legal duties to do so violate the Flood Control Act and

implementing regulations:

A.    Entering water supply contracts with various entities in the State of Georgia for
storage in the federal reservoirs in the ACT and ACF Basins as more specifically alleged in
paragraphs 70-77.

B.    Allowing water supply withdrawals from the federal reservoirs in the ACT and
ACF Basins in excess of the amounts specified in the contracts referenced in paragraph 70-77.

C.    Allowing, pursuant to specific agreements with water supply entities or otherwise,
water supply withdrawals from the federal reservoirs in the ACT and ACF Basin in the absence
of valid storage contracts, or continuing to allow water supply withdrawals on a "holdover
contract" basis after such contracts had expired, as described in paragraphs 70-77.

D.    Failing to comply with the substantive and procedural requirements of the Flood
Control Act and implementing regulations before entering into agreements and contracts
(whether temporary, interim, holdover, or otherwise) for water withdrawals from the federal

reservoirs in the ACT and ACF Basin in amounts that significantly affect the Congressionally authorized purposes of the those federal reservoirs and adversely affect existing lawful uses, as outlined in paragraphs 70-77.

E. Executing the Settlement Agreement in the D.C. Litigation, as more fully described in paragraphs 91-93.

142. Nor does the Flood Control Act grant the Corps the discretion to reallocate storage for recreation if such action would have a significant effect on other authorized project purposes or involve major changes to the operation of the reservoir. Any such action requires additional Congressional approval. Alabama alleges that the following discrete and final agency actions and failures to act in the face of mandatory, non-discretionary legal duties to do so violate the Flood Control Act and implementing regulations:

A. Establishing and implementing the "Upper Chattahoochee River Management Plan" as described in paragraphs 70-77 and 87(c ) and (h).

B. Establishing, adopting and implementing "recreation impact levels" at Lake Lanier and Lake Allatoona that significantly affect other authorized project purposes and involve major operational change, as described in paragraphs 82-87(g) and 88-90.

C. Failing to seek and obtain the required Congressional approval before engaging in operations at the federal reservoirs in the ACT and ACF Basin (including but not limited to setting action zones and recreation impact levels) that significantly impact the Congressionally authorized purposes of the those federal reservoirs and involve major operational change in those reservoirs, as described in paragraphs 78-90.

D. Determining that Lake Allatoona will not be operated to support navigation in the ACT Basin even though navigation is a Congressionally authorized project purpose, as more fully described in paragraphs 72, 82, 87(a), (b) and 88-90.

143. The Corps has therefore violated the Flood Control Act, and will continue to violate the Flood Control Act, by entering into contracts for domestic and industrial use of water under the authority of that act when there is no "surplus water" available and when those contracts for water will adversely affect existing lawful uses of water and by reallocating storage to provide more stable recreation levels when such reallocation has a significant effect on other authorized purposes and involves major operational changes at the federal reservoirs in the ACT

and ACF Basins. As a result, Alabama and its citizens have suffered and will continue to suffer severe and irreparable harm due to the serious and detrimental impacts on real property (including but not limited to riparian property), economic interests, other property interests, and aesthetic, environmental, and recreational interests in Alabama. Alabama and its citizens have direct and substantial interests in the Corps' compliance with the Flood Control Act and are within the zone of interest protected by the statute.

### SIXTH CAUSE OF ACTION

### THE CORPS' ACTIONS VIOLATE THE WATER SUPPLY ACT

144. Alabama re-alleges and incorporates by reference paragraphs 1 through 143 of this Fifth Amended and Supplemented Complaint as if fully set forth herein.

145. The Corps' past, present, and continuing *de facto* allocation and use of massive and increasing storage area in Lake Lanier, Lake Allatoona, and Carters Lake for municipal and industrial water supply purposes has seriously adversely affected and will seriously and adversely affect the existing Congressionally authorized purposes and uses of the Lake Lanier, Lake Allatoona, and Carters Lake in contravention of the Water Supply Act.

146. The Corps' own regulations, public statements, and prior actions recognize the necessity for Congressional authorization where a significant amount of storage is reallocated for municipal and industrial water supply uses. Those regulations establish a limit on reallocation, above which it is presumed that any further reallocation would require Congressional approval because it would seriously affect the project's authorized purposes:

> Reallocation or addition of storage that would seriously affect
> other authorized purposes or that would involve major structural or
> operation changes requires Congressional approval. Provided
> these criteria are not violated, 15 percent of the total storage
> capacity allocated to all authorized project purposes or 50,000 acre
> feet, whichever is less, may be allocated from the storage
> authorized for other purposes.

88

USACE ER 1105-2-100, ¶ 3-8 (b)(5) (Apr. 22, 2000); see also USACE ER 1105-2-100, ¶ 4-32(d)(1) (Dec. 28, 1990).

147.     Given the total water storage capacity of Lake Lanier and Lake Allatoona, the 50,000 acre-feet limitation set forth in USACE ER 1105-2-100, ¶ 3-8 (b)(5) is applicable in this situation, and under the Corps' regulations, the Corps may not, absent explicit Congressional approval, undertake any structural or operational changes to Lake Lanier or Lake Allatoona to allocate or use more than 50,000 acre-feet of storage for water supply purposes.

148.     The Corps has undertaken contractual obligations and operational changes that commit storage space in Lake Lanier for water supply well in excess of the 50,000 acre-feet limitation contained in the Corps regulations.  Specifically, Alabama alleges that the following Corps actions (and discrete failures to act in the face of a mandatory, non-discretionary legal duty to do so) constitute final agency action taken in violation of the Water Supply Act and reviewable under the APA:

A.     Entering water supply contracts with various entities in the State of Georgia for storage in the federal reservoirs in the ACT and ACF Basins as more specifically alleged in paragraphs 70-77.

B.     Allowing, pursuant to specific agreements with water supply entities, water supply withdrawals from the federal reservoirs in the ACT and ACF Basin in the absence of valid storage contracts, or continuing to allow water supply withdrawals on a "holdover contract" basis after such contracts, more specifically identified in paragraphs 70-77 above,  had expired.

C.     Establishing and implementing the "Upper Chattahoochee River Management Plan" as described in paragraphs 70-77 and 87(c ) and (h).

D.     Providing ARC with a guaranteed supply of 327 MGD for water supply from storage in Lake Lanier free of charge, as alleged in paragraph 70.

E.     By determining that Lake Allatoona will not be operated to support navigation in the ACT Basin even though navigation is a Congressionally authorized project purpose, as more fully described in paragraphs 82, 87(a), (b) and 88-90.

F.      Establishing, adopting, and implementing "action zones" to govern the operation of the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 78-91, 87(a), (d) and (f).·

G.      Allowing water supply intake structures to be installed in Lake Lanier and Lake Allatoona well above the bottom the conservation pools in those reservoirs, thereby effectively re-allocating massive amounts of storage to water supply without Congressional authorization, as described in paragraphs 82-86 and 87(j).

H.      Failing to seek and obtain the required Congressional approval before entering into agreements, contracts (whether permanent, temporary, interim, holdover, or otherwise) for the use of storage space in the federal reservoirs in the ACT and ACF Basin in amounts that significantly impact the Congressionally authorized purposes of the those federal reservoirs, as more fully alleged in paragraphs 70-77.

I.      Executing the Settlement Agreement in the D.C. Litigation, as more fully described in paragraphs 91-93.

149.      The Corps has recognized that water supply reallocations or additions of storage require careful scrutiny and must be accompanied by a report that includes: (a) the purpose of the report and background, including map; (b) pertinent project data table; (c) water supply needs analysis; (d) test of financial feasibility; (e) cost of storage analysis; (f) analysis of alternatives considered to address the water supply needs; (g) appropriate NEPA documentation of environmental impacts; (h) pertinent letters from affected Federal, state and local interests, including documentation of public review and comments (opportunities for public review and comments must be provided); and (i) commander's recommendation. USACE ER 1105-2-100, Appendix E, ¶ E-57 (d)(1)(Apr. 22, 2000), see also USACE ER 1105-2-100, ¶4-32(d)(1)(Dec. 28, 1990).

150.      The Corps' past, present, and continuing *de facto* allocation and use of storage, and modification of operations, in Lake Lanier, Lake Allatoona and Carters Lake for water supply purposes, as more specifically identified above, have seriously and adversely affected and will seriously and adversely affect the existing Congressionally authorized purposes of Lake Lanier, Lake Allatoona, and Carters Lake in direct contravention of the Water Supply Act by,

among other factors, holding large amounts of water in those reservoirs that would otherwise be available and utilized for hydropower generation and navigation, which in turn would provide flows into the downstream portions of the ACF and ACT Basins that flow through and adjacent to Alabama. This unlawful and unauthorized allocation seriously adversely impacts navigation, property rights, hydropower, water quality, recreation, threatened or endangered fish and wildlife, and lawful, existing riparian uses of real property in Alabama. Alabama and its citizens have direct and substantial interests in the Corps' compliance with the Water Supply Act and are within the zone of interest protected by the statute.

151. The Corps' allocation of storage in the federal reservoirs in the ACT and ACF Basins is a grant of license, authority and privilege which recognizes a claim, right, or privilege and therefore constitutes discrete and final agency action reviewable under the APA.

152. Preparation of the reports contemplated by these regulations is mandatory and non-discretionary. The Corps has not prepared the analyses and evaluations required under such regulations for any of the existing water supply contracts for Lake Lanier, Lake Allatoona, or Carters Lake. Nor has the Corps prepared the reports mandated by such regulations for the actions outlined above. The Corps' failure to prepare the required documentation constitutes agency action unlawfully withheld and is therefore reviewable under the APA.

## SEVENTH CAUSE OF ACTION

## THE CORPS HAS VIOLATED THE WATER RESOURCES DEVELOPMENT ACT

153. Alabama re-alleges and incorporates by reference paragraphs 1 through 152 of this Fifth Amended and Supplemented Complaint as if fully set forth herein.

154. The Corps has taken actions that have resulted in significant changes in the operations of Lake Lanier, Lake Allatoona, and Carters Lake, have resulted in reallocation of storage in those reservoirs, and significantly affected the authorized project purposes. Those

actions specifically include, but are not limited to:

A.   Entering water supply contracts with various entities in the State of Georgia for storage in the federal reservoirs in the ACT and ACF Basins as more specifically alleged in paragraphs 70-77.

B.   Allowing water supply withdrawals from the federal reservoirs in the ACT and ACF Basins in excess of the amounts specified in the contracts referenced in paragraphs 70-77.

C.   Allowing, pursuant to specific agreements with water supply entities, water supply withdrawals from the federal reservoirs in the ACT and ACF Basin in the absence of valid storage contracts, or continuing to allow water supply withdrawals on a "holdover contract" basis after such contracts had expired as alleged in paragraphs 70-77.

D.   Establishing and implementing the "Upper Chattahoochee River Management Plan" or "river management system" as described in paragraphs 70-77, 87(a), (c ), and 88-90.

E.   Developing and implementing management guidelines, policies, and operating rules that effectively re-allocate massive amounts of storage in the federal reservoirs in the ACT and ACF Basins from Congressionally authorized purposes such as hydropower and navigation to other uses, such as water supply and recreation, as more fully described in paragraphs 87-90.

F.   By determining that Lake Allatoona will not be operated to support navigation in the ACT Basin even though navigation is a Congressionally authorized project purpose as described in paragraphs 79, 82, 87(a), (b) and 88-90.

G.   Establishing, adopting, and implementing "action zones" to govern the operation of the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 87(a), (d) and (f).

H.   Establishing, adopting and implementing "recreation impact levels" at Lake Lanier and Lake Allatoona that result in operations which significantly impact Congressionally authorized project purposes downstream, as described in paragraphs 78-84, 82-87(g) and 88-90.

I.   Permitting water supply intake structures to be installed in Lake Lanier and Lake Allatoona well above the bottom the conservation pools in those reservoirs, thereby effectively re-allocating massive amounts of storage to water supply without Congressional authorization, as described in paragraphs 82-86 and 87(j).

J.   Executing the Settlement Agreement in the D.C. Litigation as more fully described in paragraphs 84-86 without initiating the scoping and alternatives analysis required by NEPA before choosing its "preferred" alternative.

However, the Corps has failed to comply with the public review and comment

procedures of the Corps' regulations, and the mandates of the Water Resources Development Act

of 1988, 33 U.S.C. §2312.

92

155. The Water Resources Development Act and associated regulations impose non-discretionary legal duties upon the Corps to coordinate and consult with Alabama and the public in general before reallocating storage and/or instituting major changes in the operation of federal reservoirs. The Corps' failure to fulfill those duties constitutes agency action unlawfully withheld and is therefore reviewable under the APA. The Corps' failure to comply with the Water Resources Development Act wrongfully denies Alabama and its citizens any opportunity to participate in the Corps' management of vital natural resources in which Alabama and its citizens have a clear and direct interest. As a result, Alabama and its citizens have been irreparably harmed. Alabama and its citizens have direct and substantial interests in the Corps' compliance with the Water Resources Development Act and are within the zone of interest protected by the statute.

## EIGHTH CAUSE OF ACTION

### THE CORPS HAS EXCEEDED ITS AUTHORITY BY OPERATING THE FEDERAL RESERVOIRS IN THE ACT AND ACF BASINS IN A MANNER THAT IMPERMISSIBLY REALLOCATES STORAGE AND RE-AUTHORIZES OR RE-ORDERS PROJECT PURPOSES

156. Alabama re-alleges and incorporates by reference paragraphs 1 through 155 of this Fifth Amended and Supplemented Complaint as if fully set forth herein.

157. Pursuant to 33 U.S.C. § 709, the Corps has a non-discretionary legal duty to "prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds provided on the basis of such purposes, and the operation of any such project shall be in accordance with such regulations." . As outlined above, the Corps has consciously and repeatedly operated federally owned reservoirs in a manner inconsistent with that duty and which exceeds its legal authority.

158. Specifically, as outlined above, the Corps has operated, and continues to operate,

reservoirs in the ACF and ACT Basins for the benefit of recreational use and/or drought protection for upper basin water supply at the expense of other authorized uses, specifically including navigation, that support downstream flows. By operating federally owned reservoirs for recreation at the expense of hydropower production, downstream navigation, and downstream water quality, the Corps has violated applicable federal law and its own regulations and far exceeded the scope of its authority.

159. The federally owned reservoirs in the ACT and ACF Basins were authorized by Congress to provide national and regional benefits and constructed with federal funds. The Corps has a duty to operate and maintain federally owned and operated reservoirs in a manner that is consistent with and supports the project purposes specifically authorized by Congress. The Corps does not have authority to re-allocate storage in federally owned reservoirs in a manner that abandons or significantly impacts the Congressionally authorized project purposes.

160. By modifying the operations of federally owned reservoirs in the ACF and ACT Basins for the benefit of recreation and/or drought protection for upper basin water supply at the expense of other authorized project purposes, the Corps has violated federal law and its own regulations. Alabama's downstream interests in the ACF and ACT Basins (including real property, economic interests, other property interests, and aesthetic, environmental, ecological, and recreational interests) have been harmed, and will continue to be harmed, by the Corps' unlawful and unauthorized operation of federally owned reservoirs. Alabama and its citizens have direct and substantial interests in the Corps' operations of the federal reservoirs in the ACF and ACT Basins and are within the zone of interest protected by the statutes authorizing those projects.

161. The Corps has recognized in its own regulations that, where no storage was

allocated for recreation or water supply when a federal project was authorized, recreation and

water supply are, at best, secondary to authorized project purposes for which storage was

allocated. Any reallocation of reservoir storage to provide 1) more stable recreation levels or 2)

drought contingency protection for upper basin water supply and which would have a significant

effect on other authorized purposes or involve major structural or operational change, requires

Congressional authorization. Congress has never allocated any storage for recreation or drought

protection for water supply in Lake Lanier, Carters Lake, or Lake Allatoona, and no federal

statute authorizes the Corps to reallocate massive amounts of storage for those purposes.

     162.     Specifically, Alabama alleges that the Corps has breached its duties to operate

Lake Lanier, Lake Allatoona, and Carters Lake to support the project purposes for which they

were authorized through the following final agency actions and failures to act:

     A.     Entering water supply contracts with various entities in the State of Georgia for the withdrawal of water from storage in the federal reservoirs in the ACT and ACF Basins as more specifically alleged in paragraphs 70-77.

     B.     Taking actions that have resulted in water supply withdrawals from the federal reservoirs in the ACT and ACF Basins in excess of the amounts specified in the contracts referenced in paragraph 70-77.

     C.     Authorizing, pursuant to specific agreements with water supply entities or otherwise, water supply withdrawals from the federal reservoirs in the ACT and ACF Basin in the absence of valid storage contracts, or continuing to allow water supply withdrawals on a "holdover contract" basis after such contracts had expired, as described in paragraphs 70-77.

     D.     Establishing and implementing the "Upper Chattahoochee River Management Plan" as described in paragraphs 70-77 and 87(c ) and (h).

     E.     Developing and implementing management guidelines and operational parameters that effectively re-allocate massive amounts of storage in the federal reservoirs in the ACT and ACF Basins from Congressionally authorized purposes such as hydropower and navigation to other uses, such as water supply and recreation, as more fully described in paragraphs 78-90.

     F.     Consistently and repeatedly taking actions that have resulted in holding water in upstream reservoirs while that water was needed to support downstream uses specifically authorized by Congress, as more fully described in paragraphs 70-90.

G.      By determining that Lake Allatoona will not be operated to support navigation in the ACT Basin even though navigation is a Congressionally authorized project purpose, as described in paragraphs 79, 82, 87(a), (b) and 88-90.

H.      Establishing, adopting, and implementing "action zones" to govern the operation of the federal reservoirs in the ACT and ACF Basins, as described in paragraphs 78-81, 87(a), (d) and (f).

I.      Establishing, adopting and implementing "recreation impact levels" at Lake Lanier and Lake Allatoona that result in impairment of Congressionally authorized project purposes downstream and arbitrarily and unfairly favor recreation at those reservoirs while sacrificing recreational opportunities at downstream reservoirs, as described in paragraphs 82-87(g) and 88-90.

J.      Allowing water supply intake structures to be installed in Lake Lanier and Lake Allatoona well above the bottom the conservation pools in those reservoirs, thereby effectively re-allocating massive amounts of storage to water supply without Congressional authorization, as described in paragraphs 82-86 and 87(j).

K.      Failing to seek and obtain the required Congressional approval before entering into agreements, contracts (whether permanent, temporary, interim, holdover, or otherwise) for the use of storage space in the federal reservoirs in the ACT and ACF Basin in amounts that significantly impact the Congressionally authorized purposes of the those federal reservoirs, as described in paragraphs 70-77.

L.      Failing to seek and obtain the required Congressional approval before engaging in operations at the federal reservoirs in the ACT and ACF Basin (including but not limited to setting action zones and recreation impact levels) that significantly impact the Congressionally authorized purposes of the those federal reservoirs, as described in paragraphs 82-90.

M.      Executing the Settlement Agreement in the D.C. Litigation as more fully described in paragraphs 91-93.

163.    By modifying the operations of Lake Lanier and Lake Allatoona in such a manner as to reserve large portions of the available conservation pool for recreation and/or drought contingency at times when other Congressionally authorized project purposes, such as hydropower and navigation, are not being supported, the Corps has in effect reallocated significant portions of the storage available in those reservoirs for un-authorized purposes without following any of its procedures.

164.    The Corps has no authority to conduct such a reallocation, and in so doing has

96

breached its duty to operate the federally owned reservoirs in the ACF and ACT Basins

according to their authorized project purposes and for the benefit of all users. In effect, the

Corps performed a *de facto* re-authorization of Lake Lanier, Lake Allatoona, and Carters Lake.

Only Congress can re-authorize project purposes. The Corps' *de facto* re-authorizations of Lake

Lanier, Lake Allatoona, and Carters Lake constitute discrete and final agency actions under the

Administrative Procedure Act, and are *ultra vires* as beyond its statutory authority and violate

federal law. The Corps' actions and failures to act have had a serious and detrimental impact on

real property (including but not limited to riparian property), economic interests, other property

interests, and aesthetic, environmental, ecological, and recreational interests in Alabama.

### NINTH CAUSE OF ACTION

### THE BIOLOGICAL OPINION ISSUED BY FWS ON SEPTEMBER 5, 2006 IS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, AND/OR OTHERWISE NOT IN ACCORDANCE WITH LAW

165.    Alabama re-alleges and incorporates by reference paragraphs 1 through 164 of

this Fifth Amended and Supplemented Complaint as if fully set forth herein.

166.    The Biological Opinion ("BiOp") issued by FWS on September 5, 2006, was

prepared pursuant to a request from the Corps that FWS review its so-called "Interim Operation

Plan" or "IOP," to determine whether the operations of the federal reservoirs set forth in the IOP,

as revised by the Corps' letter of June 12, 2006, would result in "jeopardy" to certain federally

protected species in the ACF Basin under the meaning of the ESA. The BiOp issued by FWS

pursuant to the Corps' request concludes that the IOP, as revised by the Corps' June 12, 2006

letter, will not result in jeopardy to the continued existence of the four species at issue – namely,

the threatened gulf sturgeon, the Chipola slabshell mussel, the endangered fat threeridge mussel,

the threatened purple bankclimber mussel – but will result in "incidental take" of members of the

latter two species. The BiOp includes an "incidental take statement" which essentially authorizes the Corps to "take", as that term is defined by the ESA and applicable regulations, members of the two species under certain conditions. Also included in the BiOp are certain "reasonably prudent alternative measures" that the Corps, in FWS' opinion, must institute to minimize the impacts of its operations under the IOP, as revised, on the species at issue. Alabama alleges that the FWS' issuance of the final BiOp on September 5, 2006, constitutes final agency action reviewable under the APA.

167.    The BiOp issued by FWS on September 5, 2006, is seriously flawed and must be set aside pursuant to the judicial review provisions of the APA. Even assuming that the Corps' operations and the IOP which FWS analyzed in the BiOp are legal -- which Alabama denies -- the BiOp at issue must be set aside because it is arbitrary and capricious, an abuse of agency discretion, and otherwise not in accordance with law.

168.    FWS used an improper environmental baseline in the BiOp, which was arbitrary and capricious and an abuse of agency discretion.

169.    The analysis of current conditions and circumstances in the ACF Basin does not reflect actual conditions and circumstances. As a result, the BiOp is arbitrary and capricious.

170.    The BiOp must also be set aside because FWS has failed to properly utilize, interpret, and apply the "best available scientific and commercial data" as required by the ESA and applicable regulations. FWS ignored critical data and misinterpreted the data it did use in reaching its conclusions and forming its opinions, or, alternatively, failed to adequately explain the relationship between the data considered and the conclusions reached. FWS's actions in this regard were arbitrary and capricious and an abuse of agency discretion.

171.    FWS has also failed to adequately explain its assumptions and conclusions

relating to the relationships between flow in the Apalachicola River and effects on the mussel species at issue. It has also failed to adequately explain its assumptions regarding the relationship between flow in the Apalachicola River below Woodruff Dam and successful sturgeon spawning activities on the rock ledges downstream of that Corps' project. Absent an adequate explanation of those assumptions, the BiOp is arbitrary and capricious and an abuse of agency discretion.

172. FWS has also identified "reasonable and prudent measures" for species protection which impermissibly mandate major changes in the operation of the federal reservoirs in the ACF Basin without Congressional approval or adherence to or conformity with applicable law. FWS has no authority to override the express mandates of Congress in this manner, and therefore the BiOp is an abuse of agency discretion and otherwise not in accordance with law.

173. The reasonable and prudent measures identified by FWS also fail to provide adequate specification of the required actions to be taken by the Corps. That failure is an abuse of agency discretion, is arbitrary and capricious, and is otherwise not in accordance with law.

174. FWS has failed to provide a proper analysis of the cumulative, indirect, and interdependent impacts of both the Corps' operations in the ACF and other public and private activities in the ACF. FWS's failures in this regard render the BiOp arbitrary and capricious and an abuse of agency discretion.

175. The action area defined in the BiOp purports to include all habitats downstream from Buford Dam. The failure to include Lake Lanier and Buford Dam in the action area is arbitrary and capricious. In addition, the analysis contained in the BiOp fails to assess the effects of the IOP on the entire action area, which was arbitrary and capricious.

176. Alabama alleges that its important sovereign interests in the ACF Basin will be

harmed unless the BiOp is set aside under the judicial review provisions of the APA.

## **RELIEF REQUESTED**

WHEREFORE, Alabama respectfully requests that this Court:

(1)     Determine and declare that the Corps' actions and failures to act as described in the foregoing paragraphs in allowing use of the storage in Lake Lanier for water supply and recreation purposes and in allowing water withdrawals and releases for water supply purposes as described above violate the Flood Control Act, the Water Resources Development Act, the Water Supply Act, the National Environmental Policy Act, and/or the Endangered Species Act.

(2)     Determine and declare that the Corps' actions and failures to act as described in the foregoing paragraphs in allowing use of the storage in Lake Allatoona and Carters Lake for recreation purposes as described above violate the Flood Control Act, the Water Resources Development Act, the National Environmental Policy Act, and/or the Endangered Species Act.

(3)     Determine and declare that the Corps has exceeded its statutory authority and the limits of its discretion by and through its actions and failures to act, as described in the foregoing paragraphs, in operating the federally owned reservoirs in the ACT and ACF Basin in the manner described herein.

(4)     Declare unlawful and set aside:

a)     The specific contracts, agreements, and operating rules described in the foregoing paragraphs;

b)     The Corps' *de facto* reallocation of storage in Lake Lanier, Lake Allatoona and Carters Lake for recreation and the specific operating rules described herein that are dependent on that reallocation of storage;

c)     The Corps' decisions, acts, and failures to act that result in operations of the federal reservoirs in the ACT and ACF Basin in a manner that does not support the

Congressionally authorized purposes of those reservoirs;

        d)      The Corps' actions and failures to act that authorize or allow withdrawals and releases of water from Lake Lanier and Lake Allatoona for municipal and industrial purposes in excess of contracted amounts and in violation of applicable law and regulation;

        e)      Water Control Plans, Reservoir Regulation Manuals, and Master Manuals in the ACT and ACF Basins that have not been validly promulgated and approved in accordance with applicable law and regulation;

        f)      The D.C. Settlement Agreement that is currently subject to this Court's preliminary injunction;

        g)      The Corps' unlawful "Chattahoochee River Management System;"

        h)      The "action zones" and "recreation impact levels" set by the Corps that result in operations which give undue preference to recreation and water supply at the expense of Congressionally authorized purposes;

        i)      The Corps' Section 404 permit for the Hickory Log Creek Reservoir.

        j)      The September 5, 2006 Biological Opinion issued by FWS relating to the Corps' operations in the ACF Basin.

    (6)      Grant appropriate injunctive relief compelling the Corps to comply, pursuant to a reasonable schedule, with the Water Supply Act, Flood Control Act, Water Resources Development Act, National Environmental Policy Act, Endangered Species Act, and/or Administrative Procedure Act,. Specifically, such relief should include injunctions:

        a)      Compelling compliance with applicable federal laws and regulations prior to further reallocations of storage (express or *de facto*) in and withdrawals from the federal reservoirs in the ACT and ACF Basins;

b)       Prohibiting operations at the federal reservoirs in the ACT and ACF

Basins, including but not limited to water supply withdrawals, re-allocations of storage, the use

of navigation windows, and the decision not to operate Allatoona and Carters for navigation that

do not comply with applicable federal law and regulation or that significantly affect the

Congressionally authorized purposes of the projects;

c)       Compelling the Corps to undertake a NEPA analysis of its operations at

the federal reservoirs in the ACT and ACF Basins that elevate recreation and water supply over

Congressionally authorized project purposes despite significant adverse effects on those

purposes, including but not limited to the "action zones" and "recreation impact levels" that have

been established in the ACT and ACF Basins and contracts or "holdover contracts" authorizing

withdrawals for water supply;

d)       Compelling the Corps to consult with the State of Alabama regarding its

operations at the federal reservoirs in the ACT and ACF Basins as required by law and

regulation;

e)       Compelling a full NEPA and ESA evaluation, including analysis of the

cumulative impacts, both direct and indirect, of the numerous reservoirs that have been permitted

or proposed in the ACF and ACT Basins, specifically including the Hickory Log Creek

Reservoir;

f)       Compelling the Corps to initiate and complete formal consultation with

the Fish & Wildlife Service under the ESA regarding its operations at the federal reservoirs in

the ACT and ACF Basins that jeopardize threatened or endangered species;

g)       Compelling the Corps to comply with NEPA prior to taking any action in

the ACT or ACF Basin that significantly affects the quality of the human environment;

h)    Compelling the Corps to develop, implement, and follow appropriate

manuals, plans, and other operating documents for the federal reservoirs in the ACT and ACF

Basins in accordance with applicable law and regulation;

i)    Compelling the Corps to bring the water supply storage contracts in the

ACT and ACF Basins into compliance with applicable law and regulation pursuant to a

reasonable schedule.

(6)    Grant Alabama reimbursement for its costs and attorneys' fees;

(7)    Grant such other relief as the Court deems proper.


Respectfully submitted this the 4th day of October, 2006.


                              /s/ Matthew H. Lembke
                              One of the Attorneys for
                              The State of Alabama,
                              Plaintiffs


OF COUNSEL:
Warren B. Lightfoot (LIG001)
John M. Johnson (JOH019)
William S. Cox, III (COX018)
W. Larkin Radney IV (RAD008)
Nikaa Baugh Jordan (JOR036)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

William D. Little, III
Assistant Attorneys General for
      the State of Alabama
11 South Union Street
Montgomery, AL  36130

Matthew H. Lembke
Joel M. Kuehnert
Bradley Arant Rose & White
Post Office Box 830709
Birmingham, AL  35283-0709

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of October, 2006, a copy of the foregoing was served upon counsel of record for all parties to this proceeding by electronic means or by placing a copy thereof in the United States Mail, first-class postage thereon prepaid and properly addressed as follows:

## Attorneys for Federal Defendants

Ruth Ann Storey
Robin N. Michael
Anthony P. Hoang
Charles W. Findlay, III
US DEPARTMENT OF JUSTICE, ENVIRONMENT &
    NATURAL RESOURCES
General Litigation Section
Ben Franklin Station
PO Box 663
Washington, DC 20044-0663

Sharon D. Simmons
Alice H. Martin
John C. Bell
US ATTORNEY'S OFFICE
1801 4th Avenue North
Birmingham, AL 35203-2101

Joseph A. Gonzales
Adrienne A. Allen
Deborah Shoemake
US ARMY CORPS OF ENGINEERS
District Counsel
109 St Joseph Street
PO Box 2288
Mobile, AL 36628-0001

## Attorneys for Intervenor-Plaintiff the State of Florida

James T. Banks
HOGAN & HARTSON LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004-1109

Lauren J. Caster
Thomas R Wilmoth
Donald G Blankenau
FENNEMORE CRAIG PC
1221 North Street, Suite 801
Lincoln, NE 68508

Caroline Smith Gidiere
Charles W. Reed, Jr.
Andrew P. Campbell
CAMPBELL WALLER & POER LLC
2100-A Southbridge Parkway, Suite 450
Birmingham, AL 35209

Christopher M. Kise
Jonathan A. Glogau
FLORIDA ATTORNEY GENERAL'S OFFICE
Department of Legal Affairs
P.L.-01, The Capitol

Parker D. Thomson
HOGAN & HARTSON LLP
1111 Brickell Avenue, Suite 1900
Miami, FL 33131

**Attorneys for Intervenor-Defendant The State of Georgia**

Thurbert E. Baker
Isaac Byrd
Robert S. Bomar
GEORGIA STATE ATTORNEY GENERAL'S OFFICE
State Judicial Building, Suite 132
40 Capitol Square, SW
Atlanta, GA 30334

Clay C. Long
R. Todd Silliman
Bruce P. Brown
MCKENNA LONG & ALDRIDGE LLP
One Peachtree Center, Suite 5300
303 Peachtree Street
Atlanta, GA 30308

William N. Clark
REDDEN MILLS & CLARK

The Financial Center, Suite 940
505 20th Street, North
Birmingham, AL 35203

## Attorneys for Intervenor Atlanta Regional Commission

Eddie Leitman
Lynne Stephens O'Neal
Christopher R. Hood
LEITMAN SIEGAL & PAYNE, PC
Land Title Building, Suite 400
600 North 20th Street
Birmingham, AL 35203-2601

Patricia T. Barmeyer
Lewis B. Jones
KING & SPALDING
191 Peachtree Street, NE, Suite 4900
Atlanta, GA 30303-1763

## Attorneys for Intervenor Gwinnett County

William M. Droze
Gregory W. Blount
David Montgomery Moore
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, NE, Suite 5200
Atlanta, GA 30308-2216

## Attorneys for Intervenor-Plaintiff Alabama Power Company

Edward S. Allen
C. Grady Moore, III
Spencer M. Taylor
BALCH & BINGHAM LLP
PO Box 306
Birmingham, AL 35201-0306

**Attorneys for Intervenor-Plaintiff Montgomery Water Works and Sanitary Sewer**

Charlanna Spencer
Chad E. Stewart
Robert Brian Tipton
SASSER LITTLETON & STIDHAM PC
PO Drawer 4539
Montgomery, AL 36103-4539

**Attorneys for Intervenor-Defendant Lake Lanier Association**

Paul E. Andrew
Seven Lumpkin Street
Lawrenceville, GA 30045

Clyde Y. Morris, Jr
3000 Brierfield Lake
Alpharetta, GA 30004

        /s/ Matthew H. Lembke
        Of Counsel

1/1488556.3